UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN LOCURTO,

               Petitioner,

     -against-

UNITED STATES OF AMERICA,

               Respondent.

**MEMORANDUM & ORDER
3-CR-1382 (NGG)
10-CV-4589 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

Stephen LoCurto brings this Motion[1] for a writ of habeas corpus to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (*See* Motion to Vacate ("Mot.") (Dkt. 2); Amended Motion to Vacate ("Am. Mot.") (Dkt. 62).)[2] LoCurto was convicted of conspiracy to participate in a RICO conspiracy and sentenced to life in prison. (*See* Judgment (*United States v. Rizzuto*, No. 3-CR-1382, (Dkt. 991)) at 1-2.) Specifically, he was convicted after a seven-week trial for his participation in the Bonanno family criminal enterprise. (*See generally* Superseding Indictment (*Rizzuto*, No. 3-CR-1382, (Dkt. 4)) (describing criminal enterprise and racketeering acts).) In contrast, many of LoCurto's co-defendants accepted plea offers for the same offenses and received considerably lower sentences. (*See e.g.,* Judgment as to Richard Riccardi (*Rizzuto*, No. 3-CR-1382, (Dkt. 973)); Judgment as to Joseph DeSimone (*Rizzuto*, No. 3-CR-1382, (Dkt. 967)).) The Second Circuit affirmed LoCurto's conviction and sentence on appeal. *United States v. Amato*, 306 F. App'x 630, 634 (2d Cir.

---

[1] Courts "generally refer to a habeas request under § 2255 as a 'motion,' [and] a habeas request under § 2254 as a 'petition.'" *Johnson v. United States,* 623 F.3d 41, 43 n.2 (2d Cir. 2010). Although Section 2255 requests are commonly referred to as either a "motion" or a "petition," the court will refer to LoCurto's habeas request as a motion.

[2] Docket references are to filings on LoCurto's civil docket, No. 10-CV-4589, unless otherwise specified.

2009). In his Amended Motion, LoCurto alleges, among other things, that he was denied effective assistance of counsel because counsel provided incorrect advice about the maximum possible sentence he could face if convicted. (*See* Mot. at 4-10; Am. Mot. at 1 (incorporating Ground One).) The court referred the Amended Motion to Magistrate Judge James Orenstein, who recommended that the court bifurcate the Amended Motion utilizing the two-prong test for ineffective assistance of counsel announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *See Locurto v. United States*, No. 10-CV-4589 (NGG) (JO), 2016 WL 11383930, at *4 (E.D.N.Y. Jan. 29, 2016). With regard to part one, the court adopted Judge Orenstein's finding that LoCurto received objectively unreasonable advice from one of his lawyers about his sentencing exposure. *LoCurto v. United States*, No. 10-CV-4589 (NGG) (JO), 2016 WL 4257550, at *6 (E.D.N.Y. Aug. 12, 2016). The court now considers the annexed report and recommendation from then-Magistrate Judge Sanket J. Bulsara concerning part two: whether LoCurto suffered prejudice as a result of the deficient legal advice. (*See* Magistrate Judge Bulsara Report & Recommendation ("R&R") (Dkt. 251) at 34.) Judge Bulsara concluded that LoCurto was not prejudiced and recommended that his Amended Motion be denied. (*Id.*) Through counsel, LoCurto requested oral argument on the parties' objections to the R&R. (Feb. 1, 2025 Ltr. Requesting Oral Argument (Dkt. 258).) For the reasons set forth below, the Court ADOPTS the R&R in part and REJECTS it in part. LoCurto's request for oral argument is DENIED and his Amended Motion is DENIED.

## I.  BACKGROUND

The court assumes the parties' familiarity with the factual background and procedural history in this matter and thus will summarize only those facts relevant to the instant motion.

On January 20, 2004, a grand jury charged LoCurto and 27 co-defendants with a racketeering conspiracy for their participation in the Bonanno family criminal enterprise, in violation of 18 U.S.C. § 1962(d). (*See* Superseding Indictment at ¶¶ 13-15.) The Superseding Indictment attributed four specific racketeering acts to LoCurto: the 1986 murder of Jospeh Platia, a conspiracy to distribute marijuana from 1991 to 1999, a conspiracy to distribute MDMA between May 1999 and June 1999, and an extortion conspiracy between May 2001 and August 2001. (*Id.* ¶¶ 47-49, 77, 103-4.)

LoCurto was represented at trial by attorney Harry C. Batchelder, Jr., who was appointed by the court at the specific request of LoCurto. (*See* Feb. 1, 2013 Batchelder Decl. ("Batchelder Decl.") (Dkt. 27) ¶ 1.) Batchelder sought the advice of attorney Laura A. Oppenheim on discrete parts of the case. (*See id.* ¶¶ 6-7.) Specifically, Batchelder sought Oppenheim's assistance in determining LoCurto's maximum possible sentence. (*Id.*) One key issue in making that determination was the fact that in 1988, Congress increased the maximum sentence for participation in a racketeering conspiracy from 20 years to life in prison, but only for cases where "the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). The only racketeering act attributed to LoCurto for which the maximum penalty was life imprisonment was the 1986 murder of Platia, which took place two years before the 1988 amendment. *Locurto v. United States*, No. 10-CV-4589 (NGG) (JO), 2016 WL 11383930, at *2 (E.D.N.Y. Jan. 29, 2016), *report and recommendation adopted*, 2016 WL 4257550, at *1 (E.D.N.Y. Aug. 12, 2016). "LoCurto's participation in the charged racketeering conspiracy—alleged to have been in existence from 1978 to 2004, and including acts attributed to LoCurto spanning the period from 1986 to 2001—was thus a so-called 'straddle offense,' meaning that it occurred over a period that straddled the

effective date of the statute that increased the maximum penalty." *Id.*[3]

LoCurto was acquitted in state court for the murder of Platia. (*See* R&R at 28.) Prior to LoCurto's federal trial, Assistant United States Attorney Greg Andres sent the attorneys representing LoCurto and his co-defendants a letter concerning potential plea agreements. (*See* Nov. 1, 2005 Ltr. from Greg Andres to Defense Counsel ("Andres Letter") (LoCurto Ex. 30)[4]; R&R at 3-5, 9-20.) The Andres Letter included specific "term[s] of incarceration" that the prosecutors assigned to the matter were prepared to recommend to their supervisors for 11 defendants, one of whom was LoCurto. (*See id.*) The letter listed a proposed term of incarceration of 20 years for LoCurto. (*Id.*) When Batchelder presented the Andres Letter to LoCurto, LoCurto told Batchelder that he could "wipe [his] ass" with the letter. (Nov. 6, 2023 Evidentiary Hr'g Tr. ("Tr.") 144:19; Nov. 3, 2004 Ltr. from Batchelder to LoCurto (LoCurto Ex. 45) ("Enclosed is the Government's letter re plea negotiations, but as you have advised me we are going to trial, I send this to you for historical interest only.").) Nine of the 11 defendants named in the Andres letter pleaded guilty, and each received a sentence less than or equal to the maximum sentence specified in the Andres Letter. *See Locurto*, 2016 WL 11383930, at *3.

The parties agree that, at a meeting between LoCurto, Batchelder and Oppenheim that took place after Batchelder received the Andres Letter, Oppenheim expressed her opinion that applying the 1988 statutory amendment to LoCurto's straddle offense would violate the Ex Post Facto Clause of the United States Constitution.

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

[4] Exhibit references are to exhibits from the evidentiary hearing on the issue of prejudice before Judge Bulsara held on November 6, 2023. (*See* Min. Entry Dated Nov. 6, 2023.)

(R&R at 5.) In Oppenheim's view, because the statutory amend-
ment could not apply to LoCurto, the maximum possible
sentence LoCurto could face if convicted at trial was 20 years.
*Locurto*, 2016 WL 11383930, at *2. (May 10, 2010 Ltr. from Op-
penheim to LoCurto (LoCurto Ex. 98) at 1 (clarifying that her
opinion during their pre-trial meeting was that it was "likely" that
LoCurto would "prevail" on appeal if this court were to apply the
statutory amendment to LoCurto).) LoCurto did not plead guilty.

Following a seven-week jury trial, a jury convicted LoCurto of
participation in a RICO conspiracy, and the court sentenced him
to life in prison. (Judgment at 2.) The Second Circuit affirmed
the conviction and sentence on appeal. *Amato*, 306 F. App'x at
634 ("Because LoCurto's testimony that he was not a member of
the Bonanno family and that he just happened on the Platia mur-
der scene and picked up the murder weapon was inherently
incredible, we do not believe that the district court's charge prej-
udiced LoCurto or that it reflected adversely on the fairness,
integrity or public reputation of judicial proceedings.").

In October 2010, LoCurto moved to vacate his sentence on the
grounds that he received ineffective assistance of counsel in vio-
lation of the Sixth Amendment at both the trial and appellate
proceedings, and that the Government improperly suppressed in-
formation tending to impeach the credibility of an accomplice
witness. (*See* Mot.; Am. Mot.) The court referred the case to Mag-
istrate Judge Orenstein. (Jul. 22, 2011 Order (Dkt. 9).) After
discovery, motion practice, and a stay pending the Supreme
Court's decision in *Lafler v. Cooper*, 566 U.S. 156 (2012), Judge
Orenstein issued his report and recommendation on January 29,
2016. *See Locurto*, 2016 WL 11383930. As to the ineffective as-
sistance of trial counsel claims, as noted above, Judge Orenstein
recommended that the court bifurcate the issues of ineffective
assistance and prejudice, determining that counsel Oppenheim's
performance fell below an objective standard of reasonableness

but deferring the prejudice determination until the court could hold an evidentiary hearing on that issue. *Id.* at *1. As to the remaining issues, Judge Orenstein recommended that the court deny the ineffective assistance of appellate counsel claim and defer ruling on the suppression claim until after LoCurto filed an amended motion. *Id.* LoCurto filed his Amended Motion on August 5, 2014.[5] (*See* Am. Mot.)

On August 12, 2016, over the Government's objections, the court adopted Judge Orenstein's report and recommendation in full. *See LoCurto*, 2016 WL 4257550, at *10. As to the ineffective assistance of trial counsel claim, the court adopted Judge Orenstein's recommendation that counsel Oppenheim's advice regarding LoCurto's sentencing exposure was objectively unreasonable, satisfying the first *Strickland* prong. *Id.* at *6. The court also adopted Judge Orenstein's recommendation that the court "conduct . . . an evidentiary hearing to determine whether that advice had any cognizable prejudicial effect on the outcome of [LoCurto's] criminal case." *Id.* at *1, *10. Then-Magistrate Judge Bulsara was later assigned to the case.[6]

---

[5] In his Amended Motion, LoCurto fully incorporated his initial ineffective assistance of trial and appellate counsel claims, (Am. Mot. at 1), amended his improper suppression claim, (*id.* at 2–17), and added a fourth claim for ineffective assistance of counsel regarding counsel's advice on the availability of CJA funds to secure an expert witness for trial, (*id.* at 18–25). The court denied LoCurto's ineffective assistance of appellate counsel claim in its August 12, 2016 decision adopting Judge Orenstein's recommendation. *LoCurto*, 2016 WL 4257550, at *10. On March 2, 2018, the court dismissed the improper suppression and CJA ineffective assistance of counsel claims. *LoCurto v. United States*, No. 10-CV-4589 (NGG) (JO), 2018 WL 1157793, at *1 (E.D.N.Y. Mar. 2, 2018). As such, LoCurto's sole undecided claim is the one addressed in this order.

[6] As Judge Bulsara is now a United States District Judge, Magistrate Judge Cheryl L. Pollak is now assigned to this case. (*See* Dec. 21, 2024 Order Reassigning Case.)

On November 6, 2023, Judge Bulsara conducted an evidentiary hearing to provide the court with a recommendation as to whether LoCurto suffered prejudice as a result of the incorrect advice of his trial counsel. (*See* Min. Entry Dated Nov. 6, 2023.) The parties also submitted post-hearing briefing. (*See* LoCurto Post-Hr'g Br. (Dkt. 243); Gov't Opp. to LoCurto Post-Hr'g Br. (Dkt. 246); Gov't Post-Hr'g Br. (Dkt. 242); LoCurto Opp. to Gov't Post-Hr'g Br. (Dkt. 248).) Judge Bulsara issued the annexed report and recommendation on November 19, 2024, recommending that the court deny LoCurto's Amended Motion because LoCurto cannot establish that he suffered prejudice as a result of any deficient attorney advice. (R&R at 34.) LoCurto and the Government both timely objected to the R&R. (*See* Gov't Obj. to R&R ("Gov't Obj.") (Dkt. 252); LoCurto Objs. to R&R ("LoCurto Objs.") (Dkt. 253).)

On December 25, 2024, LoCurto mailed two *pro se* letters to the court addressed to Judge Pollak. One of those letters requested that Judge Pollak proceed with a new hearing on his Section 2255 motion. (*See* Dec. 25, 2025 LoCurto Ltr. to Judge Pollak re Defendants Motion for a New Hearing ("LoCurto Req. for New Hr'g") (Dkt. 256).) The second letter requested that Judge Pollak take into consideration an attached letter dated October 22, 2023 that LoCurto sent to Judge Bulsara in advance of the November 6, 2023 evidentiary hearing. (*See* Dec. 25, 2025 LoCurto Ltr. to Judge Pollak re Defendant's Notice of Discovery ("LoCurto Disc. Notice") (Dkt. 257); Oct. 22, 2023 LoCurto Ltr. to Judge Bulsara re Direct Examination (Dkt. 235).) The October 22, 2023 letter included direct examination testimony and attached evidence that LoCurto intended to introduce as a part of the hearing. (*Id.*) On December 26, 2024, LoCurto wrote Judge Pollak to apologize for requesting a new hearing because he thought that Judge Bulsara's R&R had been withdrawn. (*See* Dec. 26, 2024 LoCurto Ltr. to Judge Pollak re Defendants Letter of Apology to Magistrate Pollack ("LoCurto Apology") (Dkt. 255) at 1.) LoCurto explained

that he received a message from his counsel Bernard Freamon[7] on December 23, 2024 that Judge Bulsara was no longer assigned to LoCurto's case and "the R&R is withdrawn." (*Id.* at 1-2 (attaching message).)[8]

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a court may "vacate, set aside or correct" a federal conviction or sentence "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). The Sixth Amendment provides criminal defendants the right to assistance of counsel for their defense. U.S. Const. amend VI. "The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding," *Lafler*, 566 U.S. at 165. This protection extends to pretrial plea negotiations. *See Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) ("[W]e have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel.")

To state a claim for ineffective assistance of counsel, a movant must make two showings: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) that the movant suffered prejudice as a result of the deficient representation. *Strickland*, 466 U.S. at 687-88. Under the second prong, a movant must show that "there is a reasonable probability that,

---

[7] On August 1, 2013, Judge Orenstein granted LoCurto's motion to have attorney Bernard K. Freamon appear *pro hac vice* on LoCurto's behalf. (Aug. 1, 2023 Order (Dkt. 45).) Freamon is currently LoCurto's counsel of record.

[8] The attached message lists "Abby, Normal" as the sender. (*See* LoCurto Apology at 2.) LoCurto claims Freamon sent him the message and the message indicates that the sender would do further research as to Judge Pollak's authority to adjudicate LoCurto's motion. (*Id.* at 1-2.) For the limited purpose of assessing LoCurto's requests to Judge Pollak, the court accepts that the attached message was sent by Freamon.

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Lafler*, 566 U.S. at 163 ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.") "It is not enough for the [movant] to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, he must show "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693-94.

When parties timely object to certain aspects of a report and recommendation, the court reviews those aspects of the report and recommendation *de novo*. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). Upon *de novo* review of the magistrate judge's report and recommendation, the court "may accept, reject, or modify, in whole or in part," the magistrate judge's findings. 28 U.S.C. § 636(b)(1). "A district court, however, is not required to review the factual or legal conclusions of the magistrate judge as to those portions of a report and recommendation to which no objections are addressed." *Raysor v. United States*, No. 3-CV-5418 (SLT) (JMA), 2014 WL 4658972, at *7 (E.D.N.Y. Sept. 17, 2014).

In habeas proceedings brought under 28 U.S.C. § 2255, "the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). Under § 2253(c), the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.").

## III. DISCUSSION

The sole remaining claim in LoCurto's Amended Motion is that trial counsel rendered ineffective assistance by providing deficient advice during the plea negotiations stage regarding his potential sentencing exposure. LoCurto objects to Judge Bulsara's recommendation on numerous bases, and the Government objects to Judge Bulsara's recommendation only to the extent that he recommended the court issue LoCurto a certificate of appealability. (*See* LoCurto Objs.; Gov't Obj.) For the reasons that follow, the court adopts Judge Bulsara's recommendation that the court deny LoCurto's ineffective assistance of counsel claim, and respectfully rejects Judge Bulsara's recommendation that a certificate of appealability should issue.

### A. Ineffective Assistance of Counsel

Ineffective assistance of counsel requires a two-part showing: (1) objectively unreasonable legal advice and (2) prejudice. *See Strickland*, 466 U.S. at 687-88. The court has already concluded that LoCurto met the first *Strickland* prong. *See LoCurto*, 2016 WL 4257550, at *6 ("The court agrees with Judge Orenstein that Oppenheim's advice was objectively unreasonable and, accordingly, overrules the Government's objection on this point."). The court now turns to the second *Strickland* prong concerning prejudice. The court agrees with Judge Bulsara that LoCurto cannot establish that he suffered prejudice as a result of his trial counsel's deficient advice. The court addresses—and overrules—each of LoCurto's objections in turn.

#### 1. Governing Precedent

LoCurto's first objection to the R&R is that Judge Bulsara erred by not relying on a Second Circuit case that suggested a defendant's plea bargaining strategy can be prejudiced by unreasonable advice. (LoCurto Objs. at ECF 2 (citing *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998)).) However, that argument is

misplaced because in arriving to its suggestion in *Gordon*, the Second Circuit noted that the Section 2255 movant there "did not have accurate information upon which to make his decision to pursue further plea negotiations." *Gordon*, 156 F.3d at 380. While the court acknowledges the deficiency of Oppenheim's advice, LoCurto is in a different position than the movant in *Gordon* because Batchelder clearly communicated that he had a different opinion than Oppenheim on the applicability of the 1988 amendment to LoCurto's case. (Tr. 141:25-143:5 ("I said: My -- my advice, as your attorney, is that if you blow trial, if you do not succeed at trial, you are going to do life in prison. Q And was that in front of Mr. LoCurto that you expressed your opinion of Ms. Oppenheim's advice? A Oh, yes, and Laura Oppenheim was right there.").) Furthermore, both *Lafler* and *Frye* post-date *Gordon* and provide the governing standard for proving ineffective assistance of counsel in the context of plea offers. *See Lafler*, 566 U.S. at 163; *Missouri v. Frye*, 566 U.S. 134, 147 (2012). Because Judge Bulsara correctly applied the governing Supreme Court and Second Circuit precedent to LoCurto's Amended Motion, LoCurto's objection on this ground is overruled.

### 2. Andres Letter

The November 1, 2005 letter from Assistant United States Attorney Greg Andres to the attorneys representing LoCurto and his co-defendants is a key component of the court's analysis of LoCurto's ineffective assistance of counsel claim. (*See* Andres Letter; R&R at 3-5, 9-20.) The Government argues that it never extended a plea offer LoCurto. (*See* Gov't Post-Hr'g Br. at 13-16 (arguing that the Andres Letter was not a "formal offer").) The Government's briefing and the cases cited therein do not define the requisite components of a "formal plea offer." (*See id.* at 13-16.) *See also United States v. Waters*, No. 13-CV-115, 2013 WL 3949092, at *8 (E.D. Pa. July 31, 2013) ("[W]e have been unable to find any authority defining the requisite elements of a formal

plea offer[.]"). Unlike the cases cited by the Government, which concern oral discussions between prosecutors and defense counsel on the terms of a potential plea, (*see* R&R at 11 n.6), the Government's proposal in the instant case was memorialized in writing. On its face, the Andres Letter describes specific conditions of the offer, proposed incarceration terms for each defendant, and even offers a specific time and date when defense counsel could "meet with the assigned prosecutors with respect to this *proposal*." (*See* Andres Letter (emphasis added) at 2.) And LoCurto's counsel treated the Andres Letter like an offer and communicated the same to LoCurto. (Jan. 18, 2006 Ltr. from Batchelder to LoCurto (LoCurto Ex. 50) ("I now have had an opportunity to review the Government's plea offer of November 1, 2005 . . . [and] [y]ou have advised me to reject this . . . offer[.]").)

The court agrees with Judge Bulsara that the court need not resolve the issue of whether the Andres Letter is a "formal plea offer" to decide LoCurto's Amended Motion. (R&R at 9.)[9] The dispositive question for the Amended Motion is whether LoCurto would have accepted an offer; LoCurto must establish that he *would have accepted* an offer but for Oppenheim's faulty advice to prove that he suffered prejudice. *Frye*, 566 U.S. at 147; *Lafler*, 566 U.S. at 174. To examine what LoCurto would have done had he received competent advice during the plea process, the court must look to the "totality of the evidence." *Farhane v. United States*, 121 F.4th 353, 376 (2d Cir. 2024) (en banc). In recommending that LoCurto's Amended Motion be denied, Judge Bulsara concluded that "it is plain that [LoCurto] never would have pled guilty to the charged racketeering offense." (R&R at 14.) LoCurto objects to that conclusion. (*See* LoCurto Objs. at

---

[9] "For the purposes of this report and recommendation, the Court assumes the Andres Letter was an offer that could give rise to relief under *Strickland*, *Lafler* and *Missouri v. Frye*." (R&R at 12 (citation omitted).)

ECF 2.) The court finds that the evidence supports Judge Bulsara's conclusion and overrules LoCurto's objection.

LoCurto continually refused to admit to acting on behalf of the Bonanno family criminal enterprise. LoCurto clearly understood that the commission of the charged racketeering offense required that the underlying criminal acts be done *on behalf of a criminal enterprise*. (*See* Tr. 112:2-5 ("Q  And in your case -- Well, in any racketeering case, the racketeering acts have got to be committed on behalf of an enterprise; right?  A  Yes.") This is indeed the essence of the criminal conduct that Congress prohibited when it passed the Racketeer Influenced and Corrupt Organizations Act. *See* 18 U.S.C. Ch. 96. However, "[e]ven years [after the plea negotiations], at the evidentiary hearing, LoCurto was unwilling to admit that he agreed to conduct the activities of the Bonanno crime family when he murdered Platia." (R&R at 19; *see* Tr. 112:9-12 ("Q  So your testimony today is that you are willing to accept responsibility for committing a murder on behalf of the Bonanno crime family?  A  That's not what I am saying.").)

LoCurto also objects to Judge Bulsara's R&R on the grounds that LoCurto could have "enter[ed] a plea of guilty to a RICO charge without naming the enterprise that benefitted from the criminal behavior." (LoCurto Objs. at ECF 4.) Specifically, LoCurto points to the fact that his co-defendants pleaded guilty without naming the Bonanno family criminal enterprise. (*Id.*) However, LoCurto's argument is unpersuasive because at their plea hearing, LoCurto's co-defendants confirmed that "the purpose of [their] participation in the conspiracy [was] to maintain or increase [their] position in the racketeering enterprise." (*See* Apr. 18, 2006 Plea Hr'g Tr. (*Rizzuto*, No. 3-CR-1382, Dkt. 840) 59:24-60:2 (Richard Riccardi allocution), 61:18-25 (Joseph DeSimone allocution), 63:25-64:4 (Michael Cardello allocution), 65:13-19 (John Palazzolo allocution), 67:2-16 (Peter Cosoleto allocution).) LoCurto's testimony at the evidentiary hearing

demonstrates that he had no intention of conceding that he murdered Platia as part of *any* criminal enterprise. (*See* Tr. 113:5-6 ("I don't have to plead to the enterprise or whatever you want to call it.").)

LoCurto's position is inconsistent with someone who would have been willing to accept a plea deal but for deficient advice of counsel. As Judge Bulsara correctly reasoned, "[a] defendant is a member of an 'an association-in-fact' enterprise only if he and other individuals associate 'to pursue the enterprise's purpose.'" (R&R at 19 n.10 (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)).) *See United States v. Adams*, 448 F.3d 492, 501 (2d Cir. 2006) ("[W]here [a] defendant has refused to admit to an element of the offense charged in the indictment, . . . the plea lack[s] a sufficient factual basis."). LoCurto's "inability fully to acknowledge guilt is fatal to any argument that LoCurto was willing to plead guilty to the Andres Letter offer, which was predicated on pleading guilty to RICO conspiracy." (R&R at 19.) *See United States v. Feyrer*, 333 F.3d 110, 120 (2d Cir. 2003) (reasoning that defendant's repeated assertions of his innocence after his conviction were "obviously incompatible with the suggestion that he would have readily pled guilty"). Accordingly, LoCurto's objections on these grounds are overruled.

### 3.    Prejudice from Tainted Plea Advice

LoCurto argues that Oppenheim's deficient legal advice "tainted" Batchelder's defense of LoCurto at trial. (LoCurto Post-Hr'g Br. at 20-23.) LoCurto points to a Seventh Circuit case as the primary authority for this proposition. *See Stoia v. United States*, 22 F.3d 766, 769 (7th Cir. 1994) ("[A]n attorney hired to do 'behind the scenes' work may, through deficient performance, negatively impact the trial counsel's ability to give the defendant an adequate defense.") Judge Bulsara concluded that Oppenheim's advice did not "taint" or prejudice LoCurto's defense. (*See* R&R at 21-33.) The court adopts Judge Bulsara's conclusion for two reasons.

14

First, *Stoia* and all the other cases cited by LoCurto for this proposition are out-of-circuit and inapposite because they either did not consider the petitioner's "taint" argument or were cases where attorneys were burdened by conflicts of interests while they controlled aspects of the defense. In *Stoia*, an attorney who was not counsel of record, had himself previously entered into a plea with the government not to "represent individuals charged with crimes" under investigation by law enforcement, but then was "heavily involved in preparing" the case and "directed the defense strategy." 22 F.3d at 768. The two Fourth Circuit cases that LoCurto cited have a similar fact pattern. *See Rubin v. Gee*, 292 F.3d 396, 406 (4th Cir. 2002) ("This court . . . has previously held that a conflicted attorney can taint trial counsel and render trial counsel's performance ineffective."); *United States v. Tatum*, 943 F.2d 370, 374 (4th Cir. 1991) (assistance of attorney of record was ineffective where conflicted attorney "sat at the trial table and continued to assist" the attorney of record). With regard to the unpublished District of Columbia Circuit case that LoCurto cites, that court declined to consider the defendant's "taint" claim. *See United States v. Bertram*, 762 F. App'x 1, 5 n.1 (D.C. Cir. 2019) (noting that other courts of appeals have recognized "in rare instances" that "the actions, omissions, or conflicts of a non-appearing or secondary member of a defendant's team can so 'taint' the defendant's representation as to constitute ineffective assistance," but reasoning that this sort of claim was "of no moment because [defendant] made no showing of taint, and the ineffective assistance claim fails on the merits"). Here, Batchelder alone led LoCurto's defense at trial and LoCurto has not alleged that Oppenheim was conflicted. As the Government correctly noted in its opposition to LoCurto's post-hearing brief, "LoCurto has pointed to no Second Circuit case, nor any district court case in this Circuit, in which a court has recognized a claim of ineffective assistance of counsel where a defendant ignored competent advice from his counsel of record in favor of different

15

advice from another attorney who was not his counsel of record." (Gov't Opp. to LoCurto Post-Hr'g Br. at 2.) The court is not aware of any such binding precedent. Accordingly, the court declines to apply a standard to LoCurto's ineffective assistance of counsel claim that is without Supreme Court or Second Circuit precedent.

Second, in analyzing what LoCurto "would have done" had he been offered a formal plea deal, Judge Bulsara indeed considered the "totality of the evidence." *Lee v. United States*, 582 U.S. 357, 368 (2017); *Farhane*, 121 F.4th at 376 ("The Supreme Court has emphasized that determining 'what an individual defendant would have done' as part of the prejudice inquiry 'demands a case-by-case examination of the totality of the evidence.'") (quoting *Lee*). LoCurto objects to the R&R on the grounds that Oppenheim's advice that the 1988 amendment would not apply to him was definitive legal advice from his counsel that informed his evaluation of the Andres Letter and his overall sentencing exposure. (LoCurto Objs. at ECF 4 ("[T]elling a client that his conviction would likely be reversed on appeal is not speaking in 'no uncertain terms.'") (quoting R&R).) However, Judge Bulsara correctly notes that *Batchelder*, LoCurto's counsel of record, clearly advised LoCurto that he would receive a life sentence if he went to trial and was found guilty. (R&R at 31 n.14; Tr. 141:25-142:2 ("I said: My -- my advice, as your attorney, is that if you blow trial, if you do not succeed at trial, you are going to do life in prison.").)

LoCurto cites *Byrd v. Skipper*, 940 F.3d 248, 256 (6th Cir. 2019) for his argument that "prejudice is shown where the record shows that Petitioner would have negotiated a favorable plea deal if it were not for counsel's unprofessional errors." (LoCurto Post-Hr'g Br. at 25.) The R&R highlights that LoCurto purportedly "instructed Batchelder to seek a plea offer lower than 20 years, because he understood that 20 years was the maximum sentence he would receive." (R&R at 23.) Judge Bulsara then

cites a letter from the prosecutors where they acknowledged that it was "theoretically possible" that a plea deal could have been reached consistent with the terms of the Andres Letter. (*Id.*; Sept. 6, 2016 Gov't Ltr. to Court (Dkt. 96) at 2.)

LoCurto's argument that the court should grant his motion like the court did in *Byrd* is unpersuasive for two reasons. First, the *Byrd* court recognized that where the "prosecution might explicitly refuse to craft a plea deal that meets the defendant's demands. . . . a defendant cannot establish constitutionally ineffective assistance in the plea-bargaining process because factors outside of counsel's errors precluded successful negotiations." 940 F.3d at 259. The R&R cites Batchelder's declaration, which suggests that LoCurto might have been willing to accept a plea deal that included at 10-to-15 year sentence. (*See* R&R at 16 n.8; Batchelder Decl. ¶ 2 ("Upon being assigned to Mr. LoCurto, he advised me in no uncertain terms that I was to proceed to trial and I should reject any plea offers submitted by Government counsel. Yet, at the same time he advised me to continue to negotiate a plea bargain in the range of 10 to 15 years as he would consider accepting such a plea.").) However, despite Batchelder's numerous meetings with the prosecutors to lower their proposal from 20 years, no such offer ever materialized. (R&R at 16 n.8; *see* Tr. 146:22-147:8 (Batchelder testifying that after he informed LoCurto that the Government "would not move," LoCurto "was adamant that he wasn't going to take 20 years").)

Second, Judge Bulsara correctly notes that under *Byrd*, "even assuming that 'but for counsel's errors, the petitioner would have received a plea offer,' LoCurto 'must also show that he would have accepted the offer.'" (R&R at 27 (quoting *Byrd*, 940 F.3d at 257).) LoCurto cannot make such a showing. Batchelder testified at the evidentiary hearing that LoCurto insisted that he wanted to go to trial from the outset: "One of the first things [LoCurto] ever said to me was don't try to talk to me -- talk me into getting

a plea; we are going to trial. . . . And it was based on the fact that he had so-called beaten the case in the State case before Judge Crane." (Tr. 134:22-135:9.) Despite Batchelder's efforts to "explain that this [federal] case was entirely different from the State court case" because the federal case, unlike the state case, involved organized crime charges, LoCurto was "convinced of his own ability to testify in such a manner that he would be able to prevail" in the federal trial. (*See id.* at 147:16-20.) Because LoCurto has made an insufficient showing that he would have accepted a plea deal had he been given a formal offer, the court finds that Oppenheim's deficient legal advice did not "taint" LoCurto's defense and overrules LoCurto's objection.

Because LoCurto has failed to prove that he suffered prejudice as a result of his trial counsel's conduct, his Amended Motion must therefore be denied. *See Strickland*, 466 U.S. at 687 (reasoning that where a habeas movant cannot make *both* showings that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense," it "cannot be said that the conviction. . . resulted from a breakdown in the adversary process that renders the result unreliable").

### 4.   Additional Evidence

LoCurto requests that the court "reopen the matter to take testimony on Mr. Batchelder's failure to secure an expert witness on the blood-splatter issue that would have established evidence undermining the government's case." (LoCurto Objs. at ECF 5.) LoCurto argues that Batchelder "lied" to him about the "lack of CJA funds to obtain an expert." (*Id.*) LoCurto added this claim to his request for habeas relief when he filed his Amended Motion. (*See* Am. Mot. at 18-25 (Ground Four).) In his objections to the R&R, LoCurto acknowledges that he "does not seek to reopen this issue as a ground for setting aside the conviction," but does not provide an alternative basis for why he would ask the court to take testimony on this issue. (LoCurto Objs. at ECF 5.) To the

extent that LoCurto's "lack of knowledge of Batchelder's failings also influenced [LoCurto's] behavior in the case," that argument sounds in ineffective assistance of counsel and has already been foreclosed by this court. (*Id.*) *See Locurto*, 2018 WL 1157793, at *1, *6-8 (dismissing Ground Four as untimely because LoCurto had known since 2006 which witnesses testified at trial and had ample time before and after the trial to verify Batchelder's claims on the availability of CJA funds). The court rejects LoCurto's conclusory assertion that "Batchelder had a motive to lie to [LoCurto] at the time of the trial and to lie at the evidentiary hearing in this matter." (LoCurto Objs. at ECF 5.) The court reiterates its earlier decision that LoCurto's claim on this ground is untimely. *See Locurto*, 2018 WL 1157793, at *8. Accordingly, the court denies LoCurto's request to take testimony on this issue.

LoCurto also requests leave to supply an affidavit from a witness with "contemporaneous evidence on [LoCurto's] knowledge of his sentencing exposure at the time." (LoCurto Objs. at ECF 5.) On January 5, 2025, LoCurto filed an affidavit from Jane Margulies, a woman whom LoCurto had a romantic relationship with starting in about 1999 that lasted up until his conviction. (*See* Jane Margulies Decl. (Dkt. 254) ¶¶ 3-4, 12.) Margulies declared that LoCurto's counsel first contacted her in December 2023 and contacted her again in January 2024. (*Id.* ¶ 13.) LoCurto provides no explanation for why he supplied this affidavit 11 years after he submitted his Amended Petition and over one year after the evidentiary hearing on his ineffective assistance of counsel claim. Accordingly, the court declines to consider this newly submitted evidence. *See Everson v. New York City Transit Auth.*, No. 2-CV-1121 (ENV) (JMA), 2007 WL 539159, at *2 n.1 (E.D.N.Y. Feb. 16, 2007) ("The practice of considering additional evidence after the issuance of a R & R can make the entire referral process a

wasteful one and, accordingly, this Court will not ordinarily exercise its discretion to consider such materials, especially when no explanation is given for their late submission.").[10]

In December 2024, after Judge Bulsara issued his R&R, LoCurto requested that Judge Pollak hold a new hearing and consider evidence that LoCurto had previously submitted to Judge Bulsara. (*See* LoCurto Req. for New Hr'g; LoCurto Disc. Not.) LoCurto submitted these requests based on an incorrect understanding of the case's procedural posture. (*Compare* Dec. 21, 2024 Order Reassigning Case ("Case Reassigned to Magistrate Judge Cheryl L. Pollak. Magistrate Judge Sanket J. Bulsara no longer assigned to the case. . . Motions referred to Cheryl L. Pollak") *with* LoCurto Apology at 2 (Freamon informing LoCurto on December 23, 2024 that his case was reassigned to Magistrate Judge Pollak and "the R&R is withdrawn").) Judge Bulsara's elevation to United States District Judge did not cause the R&R that Judge Bulsara issued while he was the Magistrate Judge assigned to this case to be withdrawn. While LoCurto apologized for this misunderstanding, (*see* LoCurto Apology at 1), the court nevertheless addresses LoCurto's two requests to Judge Pollak for the avoidance of doubt.

First, LoCurto's request for a new hearing is denied because Judge Bulsara already held an evidentiary hearing and LoCurto took full advantage of his opportunity to be heard. (*See* Min. Entry Dated Nov. 6, 2023; Tr. 9-130 (LoCurto testimony).)

Second, the additional evidence that LoCurto submitted to Judge Pollak is cumulative of the evidence already in the record and therefore does not change the outcome. The court discusses this additional evidence in turn. In his October 2023 *pro se* letter to Judge Bulsara, LoCurto alleged that in August 2021, United

---

[10] Even if the court could consider Margulies's declaration, it would not change the outcome of LoCurto's ineffective assistance of counsel claim.

States Bureau of Prisons ("BOP") staff wrongfully withheld his mail until shortly before his scheduled call with his attorney James Roth.[11] (*See* LoCurto Disc. Notice at 3.) LoCurto submitted the letter and several attachments into "evidence as part of [his] direct examination" for the upcoming evidentiary hearing before Judge Bulsara. (*See id.* at 2-3 ("This envelope contained Harry Batchelder's Second Supplemental Affidavit, along with a letter from James Roth my prior attorney. This letter stated 'please find an exhibit that was unmarked'")[12]; Second Batchelder Decl. (Dkt. 163-1).) In his letter, LuCurto first responds to the Second Batchelder Declaration by alleging that Batchelder "never told me I was going to get a life sentence at trial" and had a motive to lie in his second declaration because "[s]omeone got to Harry." (*See* LoCurto Disc. Notice at 4.) However, LoCurto provides no evidence to support his claim that some third party influenced Batchelder's declaration. Because the declaration substantively matches Batchelder's testimony and the documentary evidence presented at the hearing, the court finds it to be credible. (*See* Second Batchelder Decl. ¶¶ 1, 3, 4; Tr. 132-149.) LuCurto then suggests that the BOP staff were visibly happy when they gave him his mail because they read it before giving it to him and "wanted to hurt [him]." (*See* LoCurto Disc. Notice at 5.) This portion has no relevance to LoCurto's Section 2255 motion.

The attachments to LoCurto's letter similarly do not change the court's decision on the Amended Motion. Two of the attachments are communications between LoCurto and Roth [13] where

---

[11] James Roth was LoCurto's counsel from August 10, 2020 through December 28, 2021. (Aug. 10, 2020 Order (Dkt. 152) (appointing Roth as counsel); Dec. 28, 2021 Order (granting Roth's motion to withdraw).)

[12] LoCurto does not appear to have submitted the letter he received from James Roth in his submission to the court.

[13] LoCurto waived the attorney-client privilege by attaching his communications with counsel to his letter to the court. *U.S. Fid. & Guar. Co. v.*

LoCurto expressed dissatisfaction with Roth's representation. (*See* LoCurto Disc. Notice at 6 ("I told you not to contact Laura. [BOP] new [sic] what was in the letter, they told me to read it before I got on the phone."), 8 ("I can't help feeling that you are an agent for the Government.").) These communications only tangentially concern Batchelder or Oppenheim's representation of LoCurto as trial counsel; they are of no consequence to LoCurto's sole pending claim in the Amended Motion. The letter's final attachment is a document with purported notes from an interview of Laura Oppenheim that LoCurto's former counsel Alan Nelson[14] and investigator Ron Dwyer conducted on July 9, 2013. (*See id.* at 9-10.) According to the document, Oppenheim discussed how Batchelder and Oppenheim advised LoCurto as to his sentencing exposure, and while Oppenheim "[could not] recall exactly when she gave her opinion," she did "remember[] that Batchelder's reaction was that she was the law person and he therefore deferred to her. He did not disagree with the advice she gave at the meeting." (*Id.* at 9.) Oppenheim also stated that "[t]here may have been one other meeting but she is not sure." (*Id.*) However, the court takes notice that this document is marked as Plaintiff's Exhibit 78 but was not offered into evidence at the hearing. (*See* Tr. 57:3-5 ("We had objected to [Plaintiff's] Exhibits 78 to 82, those are, again, notes and emails purported to be written by Mr. LoCurto."), 57:16-17 ("THE COURT: So, first of all, [LoCurto] hasn't offered anything other than [Plaintiff's Exhibit] 79.").) Even if the court considered this document

---

*Braspetro Oil Servs. Co.*, Nos. 97-CV-6124 (JGK) (THK), 98-CV-3099 (JGK) (THK), 2002 WL 15652, at *5 (S.D.N.Y. Jan. 7, 2002) ("It is well established that voluntary disclosure of a document to a party outside the privilege waives the attorney-client privilege regarding that document.").

[14] Alan Nelson was LoCurto's counsel from April 17, 2012 through August 10, 2020. (Apr. 17, 2012 CJA Appointment (Dkt. 11); Aug. 10, 2020 Order (Dkt. 152) (granting Nelson's motion to be relieved).)

in deciding the Amended Motion, the court finds that it is cumulative of evidence already in the record.

### B.    Certificate of Appealability

Judge Bulsara recommends that the court grant LoCurto a certificate of appealability under 28 U.S.C. § 2253(c). (R&R at 34.) Judge Bulsara reasoned that because this case presents a rare occurrence where a Section 2255 movant has shown that he received objectively unreasonable advice of counsel, it is appropriate to grant LoCurto a certificate of appealability "[e]ven [though] he cannot demonstrate prejudice." (*See id.* at 34-35 (citing *Hanks v. United States*, 818 F. App'x 90, 91-92 (2d Cir. 2020)).) The Government objects to this recommendation. (*See* Gov't Obj.)

The court finds that LoCurto has failed to make a substantial showing that he was denied a constitutional right. The evidence adduced at the evidentiary hearing shows "without question, [that LoCurto was] aware that he could receive a life sentence at trial"; and LoCurto's pre-trial communications with Batchelder demonstrate that he "never would have pled guilty to the charged racketeering offense." (R&R at 31, 14.) "[R]easonable jurists" would agree that Oppenheim's deficient advice did not cause LoCurto to suffer prejudice. *See Slack*, 529 U.S. at 484. Accordingly, the court sustains the Government's objection and declines to grant LoCurto a certificate of appealability.

## IV.  CONCLUSION

For the foregoing reasons, LoCurto's Amended Motion under 28 U.S.C. § 2255 is DENIED. Because he has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

SO ORDERED.

Dated:     Brooklyn, New York
           April 10, 2025

                                           s/Nicholas G. Garaufis

                                           NICHOLAS G. GARAUFIS
                                           United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
STEPHEN LOCURTO,

                                    Petitioner,

    -against-                                                    **REPORT AND
                                                                       RECOMMENDATION**
                                                                       10-CV-4589-NGG-SJB

UNITED STATES OF AMERICA,

                                    Respondent.
----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

On October 4, 2010, Stephen LoCurto ("LoCurto")—a member of the Bonanno

crime family currently serving a life sentence—filed this petition seeking relief pursuant

to 28 U.S.C. § 2255. LoCurto alleges that he was denied effective assistance of counsel

because he received deficient advice about the maximum possible sentence he could face

if convicted, which in turn affected his approach to plea negotiations. Because of this

advice, he alleges he chose to reject plea offers and proceed to trial. At trial, LoCurto

was convicted of participation in a RICO conspiracy, and received a life sentence. The

conviction and sentence were affirmed on appeal. In contrast, several of LoCurto's co-

defendants accepted plea offers for the same crime and received substantially lower

sentences. In the years following the initial filing of his petition, Judge Nicholas G.

Garaufis, the District Judge who sentenced LoCurto, affirmed a finding (by then-

Magistrate Judge James Orenstein) that LoCurto had indeed received objectively

deficient advice from one of his lawyers about his sentencing exposure. The issue that

remains for decision is whether LoCurto suffered prejudice because of this deficient

advice.  LoCurto was appointed counsel for his petition; an evidentiary hearing was held; and substantial briefing was submitted.

The Court concludes that LoCurto has failed to establish that he suffered any prejudice as a result of counsel's deficient performance.  Because he (a) was committed to going to trial; (b) never had (and still does not have) any legitimate willingness to plead guilty, nor any willingness to plead guilty to the crime that was the *sine qua non* of any plea offer (RICO conspiracy); and (c) was fully aware of the possibility of receiving a life sentence if convicted at trial, he has failed to make the necessary showing to obtain relief.  The Court, therefore, recommends denial of his petition.  However, the Court does recommend that a certificate of appealability should issue.

<u>FACTS AND PROCEDURAL HISTORY</u>

By Superseding Indictment returned on January 20, 2004, a grand jury charged LoCurto and 27 codefendants of racketeering conspiracy: agreeing to conduct the affairs of the Bonanno Organized Crime Family through a pattern of racketeering activity between September 1978 and January 2004, in violation of 18 U.S.C. § 1962(d).[1] (*United States v. Vito Rizzuto*, No. 03-CR-1382, Superseding Indictment dated Jan. 20, 2004 ("Superseding Indictment"), Dkt. No. 4 ¶¶ 1, 14–15).  Four specific acts of racketeering activity were attributed to LoCurto: the 1986 murder of Joseph Platia, a conspiracy to distribute marijuana from 1991 to 1999, a conspiracy to distribute MDMA

---

[1] 18 U.S.C. § 1962(d) makes it unlawful to conspire to violate subsections (a), (b), and (c) of section 1962.  LoCurto was charged with conspiracy to violate subsection (c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

in May and June of 1999, and an extortion conspiracy from May through August of 2001.  (*Id.* ¶¶ 47–49, 77, 103–04).

LoCurto was represented by attorney Harry C. Batchelder, Jr. ("Batchelder"). (Decl. of Harry C. Batchelder, Jr. dated Feb. 1, 2013 ("Feb. 2013 Batchelder Decl."), Pet'r's Ex. 85 (Resp't's Ex. 76) ¶ 1).[2]  Batchelder worked with attorney Laura A. Oppenheim ("Oppenheim").  One of Oppenheim's assignments was to determine the maximum possible sentence that LoCurto could face.  (*Id.* ¶¶ 6–7).  One issue was the impact of a 1988 statutory amendment to RICO.  The amendment raised the maximum sentence that could be imposed for participation in a racketeering conspiracy from 20 years to life, but only for those cases in which "the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment[.]"  18 U.S.C. § 1963(a).  The only racketeering act attributed to LoCurto for which the maximum penalty was life was the 1986 murder of Platia, which took place prior to the 1988 amendment.  *LoCurto v. United States*, No. 10-CV-4589, 2016 WL 11383930, at *2 (E.D.N.Y. Jan. 29, 2016), *report and recommendation adopted*, 2016 WL 4257550, at *1 (Aug. 12, 2016).  "LoCurto's participation in the charged racketeering conspiracy— alleged to have been in existence from 1978 to 2004, and including acts attributed to LoCurto spanning the period from 1986 to 2001—was thus a so-called 'straddle offense,' meaning that it occurred over a period that straddled the effective date of the statute that increased the maximum penalty."  *Id.*

Prior to LoCurto's trial, on November 1, 2005, Assistant United States Attorney Greg Andres sent a letter to Batchelder and the attorneys representing ten of LoCurto's

---

[2] Unless otherwise indicated, any exhibit cited in this opinion was admitted into evidence at or following the evidentiary hearing held on November 6, 2023.

codefendants (the "Andres Letter" or "Letter").  (Letter from Greg Andres to Counsel dated Nov. 1, 2005 ("Andres Letter"), Pet'r's Ex. 30 (Resp't's Ex. 23)); *LoCurto*, 2016 WL 11383930, at *2.

The Andres Letter provided in relevant part:

> The assigned prosecutors in this matter are prepared to recommended [sic] to their supervisors that plea agreements be extended to the following defendants which will recommend the following sentences (provided these recommended sentences are consistent with proposed charges under the applicable provisions of United States Sentencing Guidelines).  Please note that because the proposed sentences listed below have not been approved by the Office, they do not constitute formal "offers."  To the extent that formal offers are extended to include the terms below (again consistent with the applicable Guidelines ranges), at least ten defendants must pled [sic] guilty pursuant to those terms and all ten defendants must do so before November 21, 2005.

| No. | Defendant | Term of Incarceration |
|-----|-----------|----------------------|
| 1 | Louis Attanasio | 20 Years |
| 2 | Peter Calabrese | 15 Years |
| 3 | Joseph DeSimone | 15 Years |
| 4 | Robert Attanasio | 10 Years |
| 5 | Michael Cardello | 15 Years |
| 6 | Peter Cosoleto | 15 Years |
| 7 | Steven [sic] LoCurto | 20 Years |
| 8 | John Palazzolo | 15 Years |
| 9 | Richard Riccardi | 15 Years |
| 10 | Anthony Basile | 15 Years |
| 11 | Patrick Romanello | 15 Years |

> To the extent counsel seeks to meet with the assigned prosecutors with respect to this proposal, the government is available to do so on Friday, November 11, 2005 at 1:00 p.m. on the 19th Floor of the United States Attorney's Office.  Please indicate below whether you are available to meet on this date.

(Andres Letter).  Nine of the 11 defendants named in letter pleaded guilty, and each received a sentence that was less than or equal to the maximum sentence specified therein.  *LoCurto*, 2016 WL 11383930, at *3.

The parties do not dispute that, at a meeting between LoCurto, Batchelder, and Oppenheim following receipt of the Andres Letter, Oppenheim expressed her opinion that applying the 1988 statutory amendment to LoCurto's straddle offense would violate the Ex Post Facto Clause of the U.S. Constitution.  In her analysis, because the statutory amendment could not legally apply to LoCurto, the maximum possible sentence LoCurto could face was 20 years.  *Id.* at *2.  In her view, if LoCurto was convicted at trial and received a life sentence, his sentence would be reversed and he would only receive 20 years.  *Id.*

LoCurto did not plead guilty.  *Id.* at *3.  Following a seven-week jury trial, he was convicted of RICO conspiracy.  (*United States v. Vito Rizzuto*, No. 03-CR-1382, Verdict Sheet dated July 12, 2006, Dkt. No. 914).  The jury found he committed the three predicate racketeering acts it considered: the 1986 Platia murder, the marijuana distribution conspiracy, and the MDMA distribution conspiracy.  (*Id.*).  LoCurto was sentenced to life in prison; the conviction and sentence were affirmed on appeal.  *United States v. Amato*, 306 F. App'x 630, 631, 634 (2d Cir. 2009).  The Court of Appeals rejected his argument that imposing a life sentence for his straddle offense was unconstitutional.  *Id.* at 633 ("LoCurto argues that his sentence violates the Ex Post Facto clause.  We reject this argument because LoCurto continued to act in the conspiracy after the effective date of the challenged amendment.  That is, LoCurto was on notice of the enhanced penalties as of the change in the law, yet he continued as a participant in the racketeering conspiracy." (internal citations omitted)).  On October 5, 2009, the Supreme Court denied LoCurto's petition for a writ of certiorari.  *United States v. Amato*, 306 F. App'x 630 (2d Cir. 2009), *cert. denied*, 558 U.S. 940 (2009).

On October 4, 2010, LoCurto, proceeding *pro se*, filed a petition pursuant to 28 U.S.C. § 2255, seeking to vacate his conviction and life sentence on the grounds of ineffective assistance of trial and appellate counsel and the improper suppression of exculpatory information.  (Pet'r's Mot. to Vacate dated Sept. 28, 2010, Dkt. No. 1).  On June 3, 2011, LoCurto sought a stay of his petition pending the Supreme Court's decision in *Lafler v. Cooper*, 566 U.S. 156 (2012).  (Pet'r's Mot. to Stay dated May 31, 2011, Dkt. No. 7).  *Lafler* decided "[w]hat remedy, if any, should be provided for ineffective assistance of counsel during plea bargain negotiations if the defendant was later convicted and sentenced pursuant to constitutionally adequate procedures[.]"  562 U.S. 1127, 1127 (2011) (granting petition for writ of certiorari).  Judge Garaufis granted the stay motion.  (Order dated July 22, 2011, Dkt. No. 9).

Following the decision in *Lafler*, and the lifting of the stay, he referred the petition to Magistrate Judge Orenstein, (Order dated Aug. 17, 2012, Dkt. No. 18), who bifurcated the case.  *LoCurto*, 2016 WL 11383930, at *4.  Judge Orenstein first addressed whether Oppenheim's advice concerning LoCurto's maximum possible sentence was objectively unreasonable under *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  *LoCurto*, 2016 WL 11383930, at *4.  *Id.*

He concluded that Oppenheim's advice was objectively unreasonable.  *Id.* at *8. He found that "Oppenheim's analysis was plainly at odds" with the Second Circuit's 1992 opinion in *United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992), decided over a decade before Oppenheim advised LoCurto.  *Id.* at *5–*7. There was no basis, in his view, to advise a client that the Ex Post Facto clause would limit a defendant's sentencing exposure to 20-years if it involved a straddle offense.  *Id.*

Because he determined that LoCurto satisfied the first prong of *Strickland*, Judge Orenstein recommended an evidentiary hearing be held to determine whether LoCurto suffered prejudice from the deficient advice. *Id.* at *7–*8. As to LoCurto's additional claims, Judge Orenstein recommended that the court deny his claim of ineffective assistance of appellate counsel and defer ruling on LoCurto's remaining claims. *Id.*

On August 12, 2016, Judge Garaufis issued an order overruling the Government's objections to the report and recommendation and adopting it in full. *LoCurto v. United States*, No. 10-CV-4589, 2016 WL 4257550, at *10 (E.D.N.Y. Aug. 12, 2016). The parties then proceeded with discovery until LoCurto again moved to stay pending the outcome of the Supreme Court's decision in *Gamble v. United States*, 587 U.S. 678 (2019). (Pet'r's Mot. to Stay dated Dec. 3, 2018, Dkt. No. 136). Judge Garaufis granted LoCurto's motion and subsequently lifted the stay following the *Gamble* decision. (*See* Order dated July 29, 2019; Pet'r's Status Report dated July 31, 2019, Dkt. No. 141).

On January 9, 2023, this case was reassigned to the undersigned. On November 6, 2023, the Court held an evidentiary hearing on whether LoCurto suffered prejudice as a result of Oppenheim's deficient legal advice. (*See* Min. Entry and Order dated Nov. 6, 2023). LoCurto filed a post-hearing brief on January 26, 2024 (Pet'r's Post-Hr'g Br. dated Jan. 26, 2024, Dkt. No. 243); the Government filed its opposition on March 8, 2024 (Resp't's Mem. of Law in Resp. dated Mar. 8, 2024 ("Resp't's Post-Hr'g Resp."), Dkt. No. 246); and LoCurto filed his reply on March 11, 2024 (Pet'r's Post-Hr'g Reply dated Mar. 8, 2024, Dkt. No. 248). The Court recommends that LoCurto's petition be

denied, because he cannot establish that he suffered prejudice as a result of any deficient attorney advice.[3]

DISCUSSION

I.    <u>Ineffective Assistance of Counsel</u>

The right to effective assistance of counsel "extends to the plea-bargaining process." *Lafler*, 566 U.S. at 163.  But a defendant who shows that he received objectively unreasonable plea advice from his lawyer must also show prejudice from that advice to obtain § 2255 relief.  That is, "[a] defendant is required to show that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *United States v. Belfiore*, 473 F. Supp. 3d 72, 90 (E.D.N.Y. 2020) (quoting *Strickland*, 466 U.S. at 694), *aff'd*, No. 22-20, 2024 WL 2075128 (2d Cir. May 9, 2024); *see also Lafler*, 566 U.S. at 163 ("[A]ll parties agree the performance of respondent's counsel was deficient when he advised respondent to reject the plea offer on the grounds he could not be convicted at trial. . . .  The question for this Court is how to apply *Strickland's* prejudice test where ineffective assistance results in a

---

[3] LoCurto filed his amended petition on August 5, 2014 (Pet'r's Am. Mot. to Vacate, Set Aside or Correct a Sentence dated Aug. 5, 2014 ("Pet'r's Am. Pet."), Dkt. No. 62); it was fully briefed on February 3, 2017.  (*See* Resp't's Resp. in Opp'n to Pet'r's Am. Pet. dated Jan. 20, 2017, Dkt. No. 119; Pet'r's Reply in Supp. dated Feb. 3, 2017, Dkt. No. 120).  In his amended petition, LoCurto fully incorporated his initial ineffective assistance of trial and appellate counsel claims (Pet'r's Am. Pet. at 1), amended his improper suppression claim (*id.* at 2–17), and added a fourth claim for ineffective assistance of counsel regarding counsel's advice on the availability of CJA funds to secure an expert witness for trial (*id.* at 18–25).  Judge Garaufis denied the ineffective assistance of appellate counsel claim in his August 12, 2016, decision adopting Judge Orenstein's recommendation.  *LoCurto*, 2016 WL 4257550, at *10.  On March 2, 2018, Judge Garaufis dismissed the improper suppression and CJA ineffective assistance of counsel claims.  *LoCurto v. United States*, No. 10-CV-4589, 2018 WL 1157793, at *1 (E.D.N.Y. Mar. 2, 2018).  As such, LoCurto's sole undecided claim is the one addressed in this recommendation.

rejection of the plea offer and the defendant is convicted at the ensuing trial."). At its

core, a "defendant must show the outcome of the plea process would have been different

with competent advice." *Id.* at 163. To do so:

> a defendant must show that but for the ineffective advice of counsel there is
> a reasonable probability that the plea offer would have been presented to
> the court (*i.e.*, that the defendant would have accepted the plea and the
> prosecution would not have withdrawn it in light of intervening
> circumstances), that the court would have accepted its terms, and that the
> conviction or sentence, or both, under the offer's terms would have been
> less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 164. So, despite the passage of time and the quantity of briefs, letters, arguments,

and opinions, only a single issue remains to be decided: whether LoCurto suffered

prejudice as a result of advice given to him by Oppenheim.

    A.  The Status of the Andres Letter as a "Plea Offer"

    The parties spend much time disputing whether the Government made a plea

offer of 20 years to LoCurto in the Andres Letter. The Court does not need to resolve the

issue.

    The Letter conveys an intention to begin plea negotiations, and simultaneously

includes the "terms" of a "proposal" for each defendant, including LoCurto. (Andres

Letter at 1 ("[A]t least ten defendants must pled [sic] guilty pursuant to these terms and

all ten defendants must do so before November 21, 2005."); *id.* at 2 ("To the extent

counsel seeks to meet with the assigned prosecutors with respect to this

proposal . . . .")). It includes a list naming each defendant and a proposed term of

incarceration for each. (*Id.*). "[N]ine of the 11 defendants named in the [Andres Letter]

ultimately pleaded guilty, and each was sentenced to a prison term that was less than or

equal to the maximum sentence that had been specified in the letter." *LoCurto*, 2016

WL 4257550, at *2. The United States Attorney's Office ("USAO") did not withdraw or

reject any of the proposals contained in the Letter, nor did the Court.  In 2005, Batchelder viewed the letter as a plea offer—and communicated the same to LoCurto. (Letter from Batchelder to LoCurto dated Jan. 18, 2006 ("Jan. 18, 2006 Letter"), Pet'r's Ex. 50 (Resp't's Ex. 26) ("I now have had an opportunity to review the Government's plea offer of November 1, 2005 . . . [and] [y]ou have advised me to reject this . . . offer[.]")).

The Government contends, nonetheless, that relief is unavailable to LoCurto because any offer was not a "formal offer."[4]  (*See* Resp't's Post-Hr'g Mem. of Law in Further Opp'n dated Jan. 26, 2024 ("Resp't's Post-Hr'g Br."), Dkt. No. 242 at 13–15).  It also contends that the offer is too amorphous to warrant relief, since it does not indicate what offense a defendant would have to plead to.  (*Id.* at 14).  And, furthermore, that any offer was subject to review and rejection by the USAO or the Court.  (*Id.* at 15–16).

Although it contends that a formal offer is required for relief, it never defines what constitutes a "formal plea offer," nor do the cases it cites.  *See United States v. Waters*, No. CIV.A. 13-115, 2013 WL 3949092, at *8 (E.D. Pa. July 31, 2013) ("[W]e have been unable to find any authority defining the requisite elements of a formal plea offer[.]").  In many respects, the Government appears to conflate a "formal offer" with a "plea agreement."  There are elements of the Andres Letter that were not finalized,

---

[4] The Government argued this very issue—whether the Andres Letter was a formal offer—before, and Judge Garaufis suggested it was incorrect.  *LoCurto*, 2016 WL 4257550, at *9 ("Here, while the Government disclaimed the formality of the communication at issue, the fact that it was written, set a deadline for guilty pleas, and listed specific recommended maximum sentences for each defendant suggests that it might satisfy the *Frye* criteria for a formal offer, assuming there is such a requirement.").  The Government has not presented any new evidence—from any internal deliberations or percipient witnesses—to clarify the issue since then.

uncertain, or subject to Court approval.[5]  But the offers in the cases cited by the Government are in a wholly different category than the Andres Letter.  The Andres Letter was a written proposal, with specific conditions, proposed terms of incarceration, and recommendations from the line-prosecutors, and subsequent conduct was entirely consistent with the Government and counsel treating the Letter as an offer.  The Government's cases are inapposite for other reasons: they involve oral discussions and not a written proposal from the Government.  (*See* Resp't's Post-Hr'g Br. at 13–14 (citing *Samet v. United States*, No. 01-CR-216, 2011 WL 5548012, at *8 (S.D.N.Y. Nov. 14, 2011) ("Samet offers no evidence that there *was* an offer, and the Government denies making one.  The motion is devoid of any facts about any preliminary discussions among counsel; there is no information about what sort of plea was under consideration, or what the possible guidelines sentence might have been."), *aff'd*, 559 F. App'x 47 (2d Cir. 2014))).[6]

---

[5] The Government misses the mark on the Court approval point.  (Resp't's Post-Hr'g Br. at 15 ("[T]he [D]istrict [C]ourt would still have had authority to reject the parties' recommended sentence or to reject the plea agreement.")).  "[T]he proper inquiry is not whether the sentencing court is bound by a plea agreement, but whether it is reasonably probable that the court 'would have accepted its terms,' and the resulting sentence 'would have been less severe' than the one that was actually imposed."  *Day v. United States*, 962 F.3d 987, 993 (7th Cir. 2020) (quoting *Lafler*, 566 U.S. at 164).  "Few court observers would contend that the government's views as reflected in its plea stipulations and Guidelines recommendations have no influence on a judge's real-world sentencing decisions."  *Id.*  Here, Judge Garaufis accepted each of the plea agreements for all the defendants who pleaded guilty, and imposed sentences equal to or *less* than those in the Andres Letter.

[6] *See also Merzbacher v. Shearin*, 706 F.3d 356, 369–70 (4th Cir. 2013) (denying habeas relief where plea discussions were oral and defendant had multiple pending cases); *Mavashev v. United States*, No. 11-CV-3724, 2015 WL 1508313, at *8 (E.D.N.Y. Mar. 31, 2015) ("Petitioner contends that the government orally offered a plea agreement with a sentencing guideline range of 46–57 months."); *Levitis v. United States*, No. 15-CV-8977, 2020 WL 2836375, at *13 (S.D.N.Y. May 31, 2020) ("As an

To be sure, the Letter does say it is not a "formal offer," and disavows that it is such. Yet, if not a formal offer, it is indisputably an informal offer (or "proposal" as it repeatedly says). And several courts have held that incompetent attorney advice about an informal offer—particularly when written and with other indicia of concreteness—can prejudice a defendant. *See, e.g.*, *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) ("[W]hether the government had made a formal plea offer was irrelevant because Gordon was nonetheless prejudiced[.]"); *Merzbacher*, 706 F.3d 356, 369–70 (4th Cir. 2013) (recognizing "there may be cases in which a petitioner can show *Strickland* prejudice *despite the incipience of the plea offer* he did not accept due to his counsel's lack of communication or inadequate advice") (emphasis added); *Carmichael v. United States*, 659 F. App'x 1013, 1022–23 (11th Cir. 2016) (granting evidentiary hearing regarding prejudice from advice related to informal plea offers); *United States v. Polatis*, No. 2:10-CR-0364, 2013 WL 1149842, at *10 (D. Utah Mar. 19, 2013).[7]

Ultimately, the Court does not need to—and does not—resolve the factual and legal dispute on this point. For the purposes of this report and recommendation, the Court assumes that the Andres Letter was an offer that could give rise to relief under *Strickland*, *Lafler*, and *Missouri v. Frye*, 566 U.S. 134 (2012). But LoCurto must also show he would have accepted the plea offer—and the evidence shows that he was

---

initial matter, the Government represents that the plea offer Levitis accepted was the only written plea offer issued by the Government to Levitis. Levitis does not dispute this assertion in his reply papers." (citations and quotations omitted)).

   [7] The Government makes the somewhat curious argument that the Andres Letter contained no requirement or indication of what crime LoCurto would have to plead guilty to. (Resp't's Post-Hr'g Br. at 14–15). But he was only charged with one count for racketeering conspiracy, albeit with four predicate acts of racketeering. (Superseding Indictment ¶¶ 13–15, 47–49, 77, 103–04).

determined to proceed to trial, not to plead guilty.  And since he would not have

accepted the Andres Letter offer (or any other offer), he cannot demonstrate prejudice

from the incompetent attorney advice.

      B.    <u>Prejudice from Failure to Accept the Andres Letter Offer</u>

Assuming that the Andres Letter constituted a plea offer, that does not end the

inquiry and entitle LoCurto to the relief he seeks.  Far from it.  "To show prejudice from

ineffective assistance of counsel where a plea offer has lapsed or been rejected because

of counsel's deficient performance, defendants must demonstrate a reasonable

probability they would have accepted the earlier plea offer had they been afforded

effective assistance of counsel."  *Frye*, 566 U.S. at 147; *see also Lafler*, 566 U.S. at 174

(petitioner must show that "but for counsel's deficient performance there is a reasonable

probability he and the trial court would have accepted the guilty plea"); *Purdy v. United

States*, 208 F.3d 41, 49 (2d Cir. 2000) ("Purdy must demonstrate a reasonable

probability that but for [counsel's] deficiencies, Purdy would have pled guilty.").

"[D]etermining 'what an individual defendant would have done' as part of the prejudice

inquiry 'demands a case-by-case examination of the totality of evidence.'"  *Farhane v.

United States*, No. 20-1666, 2024 WL 4634065, at *16 (2d Cir. Oct. 31, 2024) (quoting

*Lee v. United States*, 582 U.S. 357, 367–68 (2017)).

"[A] significant sentencing disparity in combination with defendant's statement

of his intention is sufficient to support" a conclusion that he would have pled guilty.

*Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).  While the disparity between a

20-year sentence from a plea deal and a post-trial life sentence would suggest, if not

create a presumption, that LoCurto would have taken an offer, "such a conclusion is not

mandated" where the defendant's "assertions that he would have accepted the plea are

not credible." *Belfiore*, 473 F. Supp. 3d at 98; *United States v. Frederick*, 526 F. App'x 91, 93 (2d Cir. 2013) ("Even with such a disparity, however, the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible.").  "[C]ourts are required to locate from the plea bargain process contemporaneous evidence to substantiate a defendant's expressed preferences." *United States v. Kearn*, 90 F.4th 1301, 1310 (10th Cir. 2024) (quotations omitted).

LoCurto cannot demonstrate prejudice from incompetent advice regarding the Andres Letter, because it is plain that he never would have pled guilty to the charged racketeering offense.

At the evidentiary hearing, LoCurto made a series of astounding pronouncements suggesting that he was open to pleading guilty to any charge, for any murder, or any crime that would get him a 20-year sentence.  (Tr. of Evidentiary Hr'g dated Nov. 6, 2023 ("Nov. 6 Hr'g Tr.") at 110:20–111:3 ("Q: So is it your testimony that you would have admitted that you committed the murder of Joseph Platia?  A: . . . . I'm prepared to allocate [sic] to a – a – to a murder charge at the time, I'm prepared to do it, yes.  I'm prepared to allocate [sic] to a murder charge if it comes up, if it's necessary."); *id.* at 111:4–111:15 ("Q: And your testimony is that even at the time you went to trial, around 2005, 2006, you would have admitted that you killed Joseph Platia?  A: . . . . So, yes, if the time comes, even now, if you offer me a plea allocution to plead guilty for sure, Mr. AUSA, I will allocute to a homicide of anyone you particularly care for.")).  And he seemed to say that he would have done the same thing back in 2005 had he been given correct advice about his sentencing exposure.  (*Id.* at 77:9–77:13 ("I'm not looking to get a life sentence, you know.  I might be the least educated person in the room, but I'm not

14

stupid and I'm not gonna go gamble a life sentence where it's a guaranteed versus a 20-year where it's a possibility.")).  But this testimony was not credible; his statements are not reflective of a willingness either to plead guilty now or credible evidence that he would have pled guilty in 2005 or 2006.  As explained below, it is in tension with all of the objective evidence.  LoCurto's testimony is instead a bald and "implausible" last ditch attempt to take any step to get a lower sentence and get out of prison.  *Zandi v. United States*, 460 F. App'x 51, 53 (2d Cir. 2012); *cf. Meszaros v. United States*, 201 F. Supp. 3d 251, 276 n.25 (E.D.N.Y. 2016) (finding no evidence that defendant would "relinquish his claim that he is not guilty" where defendant "would not admit that he was guilty, allowing only that he 'would have had no choice' but to plead guilty if he had known that he would be sentenced to 151 months" (quoting hearing transcript)).

For one thing, the objective indicia demonstrate that LoCurto firmly rejected any offer in the Andres Letter.  When Batchelder presented the Andres Letter to him, LoCurto told Batchelder he could "wipe [his] ass" with the letter.  (Nov. 6 Hr'g Tr. at 144:19; *see also* Letter from Batchelder to LoCurto dated Nov. 3, 2004 ("Nov. 3, 2004 Letter"), Pet'r's Ex. 45 ("Enclosed is the Government's letter re plea negotiations, but as you have advised me we are going to trial, I send this to you for historical interest only.") (forwarding Letter from Greg Andres to Counsel dated Nov. 1, 2004, Pet'r's Ex. 44 (Resp't's Ex. 12)); Letter from Batchelder to LoCurto dated Jan. 10, 2006 ("Jan. 10, 2006 Letter"), Pet'r's Ex. 49 (Resp't's Ex. 25) ("You have advised me that you do not wish to accept the Government's plea offer and I will convey that to Government counsel.") (forwarding Andres Letter); Jan. 18, 2006 Letter ("You have advised me to reject this less than, in your mind, acceptable offer and I have so advised Greg Andreas

[sic] on this date.  I have, consistent with the dictates of gentlemanly requirements, not conveyed your expletives.")).[8]

LoCurto's core intention was to proceed to trial.  And his desire to do so was not motivated by a belief that he would only receive a 20-year sentence, but instead, his confidence that he would be acquitted of Platia's murder.  LoCurto wanted to go to trial in federal court, because he had been acquitted of Platia's murder in state court.  Batchelder testified:

> Q: At the outset of your representation of Mr. LoCurto, did you have any discussions with him about his interest in going to trial or taking a guilty plea?
>
> A: Yes.  Stephen—I had met him and we spoke and he was adamant.  One of the first things he ever said to me was don't try to talk to me—talk me into getting a plea; we are going to trial.  And I beat a case in State, which was the predicate act for murder here, and I'm going to take it to trial. . . . So I was pretty clear that he wanted to go to trial and he was going to go to trial.  And it was based on the fact that he had so-called beaten the case in the State case before Judge Crane.

(Nov. 6 Hr'g Tr. at 134:18–135:9; *see also* Feb. 2013 Batchelder Decl. ¶ 5 ("Petitioner . . . told me he 'beat it' and advised me that he had 'beaten' the state court case by testifying at trial and he would 'beat this case also.'"); *id.* ¶ 9 ("Petitioner continually ordered me to proceed to trial as he was confident he could 'sell the story' as he had done in the New York State prosecution.")).

---

[8] There is perhaps slightly more nuance to this account.  Batchelder consistently maintained that LoCurto wanted to go to trial and gave a blanket instruction to reject all plea offers.  (*See* Feb. 2013 Batchelder Decl. ¶ 2 ("Upon being assigned . . . he advised me in no uncertain terms that I was to proceed to trial and I should reject any plea offers submitted by Government counsel.")).  But he also acknowledged that, "at the same time [LoCurto] advised me to continue to negotiate a plea bargain in the range of 10 to 15 years as he would consider accepting such a plea."  (*Id.*; *see also id.* ¶ 5 ("I periodically contacted Assistant United States Attorney John Buretta . . . the Government . . . was unwilling to lower their initial plea offer of twenty years.")).  There was, of course, no 10-to-15 year offer made to LoCurto in the Andres Letter, or indeed at any time.

Thus, the objective contemporaneous evidence—which LoCurto does nothing to dispute in his papers—demonstrates that he would not have taken the plea offer in the Andres Letter, and he cannot obtain relief under *Strickland*. *E.g.*, *Frederick*, 526 F. App'x at 93–94 ("[C]ontemporaneous emails sent by [counsel] corroborate his account of [defendant's] obstinacy about proceeding to trial despite the likelihood of receiving a fifty-year prison sentence. Though those emails also show that [defendant] eventually became willing to accept a ten-year prison term, this alone does not refute [counsel's] testimony . . . . Ten years was still less than the likely prison term under the government's plea offer, and the district court did not clearly err[.]").

LoCurto's post-conviction self-serving testimony, including general statements that he would have accepted the Andres Letter offer—or indeed any plea offer—is not sufficient "objective evidence" to warrant habeas relief. *Gordon*, 156 F.3d at 380–81 (quoting *Toro v. Fairman*, 940 F.2d 1065, 1068 (7th Cir. 1991)); *United States v. Knight*, 981 F.3d 1095, 1101 (D.C. Cir. 2020) ("A criminal defendant alleging ineffective assistance of counsel generally may not rely solely on *post hoc* testimony to show that he would have accepted the plea offer if he had been properly advised."); *e.g.*, *Muyet v. United States*, No. 03-CV-4247, 2009 WL 2568430, at *5 (S.D.N.Y. Aug. 19, 2009) ("[P]etitioner's belated assertion that he would have accepted the guilty plea had he been more thoroughly informed by counsel is not objective evidence that contradicts this Court's previous determination that throughout the trial there was no indication that Muyet was willing to accept guilt.").

Quite separately, despite his general statements about a willingness to plead guilty for any murder or any crime, it was also clear that when pressed, LoCurto has no

intention to—and never had any intention to—admit to conduct that satisfies the elements of a RICO conspiracy, the only charged felony in the Indictment.

To be convicted of conspiracy under 18 U.S.C. § 1962(d), the government must prove "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering." *United States v. Capers*, 20 F.4th 105, 117–18 (2d Cir. 2021) (emphasis omitted) (quotations omitted). "[T]he agreement proscribed by section 1962(d) is a conspiracy to participate in a charged enterprise's affairs through a pattern of racketeering[.]" *Id.* (quotations omitted).

Despite, on the one hand, his avowed intention to plead guilty to any crime that would garner a 20-year sentence, LoCurto steadfastly refused to concede or admit that he agreed to commit murder as a member, to further the purposes, or on behalf, of the Bonanno crime family. Indeed, at his criminal trial, LoCurto maintained that he was not a member of the Bonanno family. (*United States v. Vito Rizzuto*, No. 03-CR-1382, Tr. of LoCurto Trial dated June 29, 2006, Dkt. No. 1036 at 3334:21–3334:23). He maintained that same position at the evidentiary hearing. LoCurto was asked, "So your testimony today is that you are willing to accept responsibility for committing a murder on behalf of the Bonanno crime family?" (Nov. 6 Hr'g Tr. at 112:9–112:11). LoCurto disavowed any such intention: "That's not what I am saying." (*Id.* at 112:12).

"By his agreement, a RICO defendant signals his membership in a conspiracy to conduct the affairs of the charged enterprise." *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987). As such, a defendant cannot be liable for RICO conspiracy unless he agreed with others to associate himself with the charged enterprise. "Simply committing predicate acts" or agreeing to perform predicate acts "unrelated to the enterprise" does not amount to a RICO conspiracy. *United States v. Scotto*, 641 F.2d 47,

54 (2d Cir. 1980).[9]  "[A] RICO conspiracy is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering.  Nor is it merely an agreement to join in a particular enterprise.  Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs through a pattern of racketeering."  *United States v. Pizzonia*, 577 F.3d 455, 464 (2d Cir. 2009).

Even years later, at the evidentiary hearing, LoCurto was unwilling to admit that he agreed to conduct the activities of the Bonanno crime family when he murdered Platia.  "[W]here [a] defendant has refused to admit to an element of the offense charged in the indictment, . . . the plea lack[s] a sufficient factual basis."  *United States v. Adams*, 448 F.3d 492, 501 (2d Cir. 2006).  No judge could accept a guilty plea to a racketeering conspiracy offense where the defendant admits to committing murder, but simultaneously refuses to admit to being a member of or associating with the enterprise on whose behalf he committed murder.  That simply is not pleading guilty to the charged crime.  That might be sufficient for a guilty plea to the crime of murder, but it is not sufficient for a RICO conspiracy charge.[10]  This inability fully to acknowledge guilt is fatal to any argument that LoCurto was willing to plead guilty to the Andres Letter offer, which was predicated on pleading guilty to RICO conspiracy.  And ultimately, where there is no evidence that a defendant would have pled guilty to the crime in the plea

---

[9] *Scotto* was overruled on other grounds by *Reves v. Ernst & Young*, 507 U.S. 170 (1993).  *See Napoli v. United States*, 45 F.3d 680, 682 (2d Cir. 1995).

[10] LoCurto claims that admitting he was part of "a group of people associated in fact," (Nov. 6 Hr'g Tr. at 113:1–113:17), would permit him to plead guilty to RICO conspiracy, and he would not need to admit association with the Bonanno crime family. That is wrong.  A defendant is a member of an "an association-in-fact" enterprise only if he and other individuals associate "*to pursue the enterprise's purpose*."  *Boyle v. United States*, 556 U.S. 938, 946 (2009) (emphasis added).  LoCurto disavowed any such purpose.

offer, no prejudice can exist from ineffective plea advice.  *E.g.*, *Herzog v. United States*, 38 F. App'x 672, 675 (2d Cir. 2002) ("We note that in his affidavit in the § 2255 proceeding below, Herzog did not unequivocally state that he would have accepted the Government's plea offer but for Santangelo's allegedly deficient advocacy.  The record on appeal suggests that it was not until his reply to the Government's opposition papers that Herzog stated that he would have accepted the offer, and then he did so in qualified terms."); *United States v. Feyrer*, 333 F.3d 110, 120 (2d Cir. 2003) ("Yost does not indicate any unequivocal willingness to plead guilty and his affidavits repeatedly assert his innocence, a position that is obviously incompatible with the suggestion that he would have readily pled guilty.  Under these circumstances, Yost has failed to demonstrate the required reasonable probability that, but for Fidler's performance as counsel, he would have pled guilty.").

LoCurto's continued vehemence in denying membership in the Bonanno family demonstrates that his purported willingness to accept the plea is a kind of result-oriented performative gymnastics.  On the one hand, though willing and eager to "allocate [sic] to a homicide of anyone," he could not at the same time bring himself to say he committed acts on behalf of the Bonanno family.  All of which is to say that his testimony that he would have accepted the Andres Letter offer if properly counseled about his sentencing risk was not, based on his demeanor and statements, credible.

Thus, any prejudice from his failure to accept the Andres Letter offer is nothing other than post-hoc regret over the outcome of his decision to go to trial.  Habeas relief is not available for someone in that position.  *E.g.*, *Crisci v. United States*, 108 F. App'x 25, 28 (2d Cir. 2004) ("We find that the District Court did not err as to its prejudice determination because Crisci has failed to establish a reasonable probability that he

would have pled guilty, given the evidence that he was, in fact, not interested in doing so."); *Page v. Martuscello*, 561 F. App'x 118, 119 (2d Cir. 2014) ("Page testified that he would have accepted a plea resulting in a 12-year sentence had he understood his true sentencing exposure.  The state trial court rejected Page's testimony as self-serving and incredible and concluded that Page failed to establish a reasonable probability that but for [counsel's] alleged deficiencies, he would have entered a plea of guilty.  While we agree that Page's counsel provided deficient representation, we cannot reject the state court's conclusion that Page failed to establish that he was prejudiced by his counsel's errors." (citations and quotations omitted)).

    B.  <u>Prejudice from Tainted Plea Advice</u>

The Court turns now to the second prejudice argument advanced by LoCurto: that the faulty advice offered by Oppenheim "tainted" his approach to plea negotiations

and trial.[11]  The Government does not address this argument.[12]  In its strongest light, this "taint" argument is an attempt by LoCurto to untangle the actual plea offer (or lack thereof) with his strategy to proceed to trial.  As noted, LoCurto is first arguing that, but for his counsel's bad advice, he would have accepted the offer in the Andres Letter.  But LoCurto is *also* arguing that his entire strategy—even to pursue plea negotiations at all— was affected by his belief, based on bad advice, that he would never receive a life

---

[11] The Government suggests that Oppenheim was not acting as LoCurto's counsel. This position is nonsense.  Oppenheim's name appears on countless briefs and letters filed on LoCurto's behalf; she was hired by Batchelder to provide advice on the Ex Post Facto issue, among others; she regularly met with and spoke with LoCurto; and Judge Orenstein already concluded, and Judge Garaufis accepted, that LoCurto was given deficient advice by her.  (*See, e.g.*, Letter from Oppenheim to LoCurto dated Mar. 8, 2005, Pet'r's Ex. 6 (Resp't's Ex. 17); Letter from Oppenheim to Judge Garaufis dated Feb. 24, 2006, Pet'r's Ex. 10 (Resp't's Ex. 30); Letter from Oppenheim to Judge Garaufis dated June 1, 2006, Pet'r's Ex. 18 (Resp't's Ex. 59); Mot. in Lim. filed by Batchelder and Oppenheim dated June 20, 2006, Pet'r's Ex. 21 (Resp't's Ex. 61); Mem. in Supp. of J. of Acquittal filed by Batchelder and Oppenheim dated June 25, 2006, Pet'r's Ex. 23 (Resp't's Ex. 62); *see also* Nov. 6 Hr'g Tr. at 25:1–26:9, 74:7–76:9); *LoCurto*, 2016 WL 4257550, at *6.  In light of this substantial involvement, the government's repeated attempt to undermine and relitigate her involvement, (Resp't's Post-Hr'g Br. at 5–6), by overly focusing on formalities of who was on the CJA panel is unpersuasive.  And the cases it cites—including *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994) ("Here, the allegedly incompetent advice came from a lawyer who had no previous connection to the case and who was not representing Martini in his defense.")—are decidedly inapposite.

Indeed, the Government's position—that a distinction exists between appearing and non-appearing counsel for the purposes of the right to effective assistance of counsel—is unmoored from the Sixth Amendment.  "An attorney's constitutional ineffectiveness can manifest itself at trial even though the attorney never appears in court.  For example, a defendant may hire more than one attorney to work on his criminal case, but only one of them may actually enter an appearance and represent him in court. . . .  [A]n attorney hired to do 'behind the scenes' work may, through deficient performance, negatively impact the trial counsel's ability to give the defendant an adequate defense."  *Stoia v. United States*, 22 F.3d 766, 769 (7th Cir. 1994).

[12] To be sure, the Government does take issue with some of the cases cited by LoCurto, (Resp't's Post-Hr'g Resp. at 1–3), but its reply brief ignores the core of the argument, including LoCurto's extended discussion of *Byrd*.  (*See id.*; Pet'r's Post-Hr'g Br. at 25–27).

sentence.  *See Day v. United States*, 962 F.3d 987, 993 (7th Cir. 2020) ("[T]he Sixth Amendment right to the effective assistance of counsel 'extends to the plea-bargaining *process*,' not just to discrete parts of it." (quoting *Lafler*, 566. U.S. at 162)).

For instance, LoCurto contends he instructed Batchelder to seek a plea offer lower than 20 years, because he understood that 20 years was the maximum sentence he would receive.  (*See* Pet'r's Post-Hr'g Br. at 19 ("Batchelder's efforts were understandably directed toward seeking to reduce the sentence of 20 years proposed for Petitioner."); *id.* at 24 ("[A]ctive negotiations had begun and were in progress until they came to stop [sic].  Petitioner argues, and he testified, that this was effectively because, based on Oppenheim's advice, he had no reason to accept the 20-year offer as this was the worst he could get . . . .  [T]he . . . deficient advice that [Oppenheim] gave brought the plea discussions around the 20-year proposed sentence to a halt[.]")).  In other words, with the benefit of competent advice—and with the knowledge that he could face a life sentence—LoCurto would have pursued a different plea negotiation strategy with the Government: instead of rejecting discussions about a 20-year offer, he would have entertained such a conversation.

Indeed, the Government cannot say it would not have entertained such an overture:

> [T]he government cannot and will not argue that the government would not have offered LoCurto the opportunity to enter into a plea agreement consistent with the terms described in the government's letter dated November 1, 2005 had plea negotiations commenced as it is theoretically possible that such a plea offer could have been drafted, approved by required supervisors and ultimately extended.

(Letter from Assistant U.S. Attorney Taryn Merkl to Judge Garaufis dated Sept. 6, 2016, Dkt. No. 96, at 2 (quotations omitted)).

The prejudice inquiry "inevitably require[s] a backward-looking counterfactual assessment of what the world would have been absent ineffective assistance. Complicating this inquiry is the defendant's after-the-fact knowledge that he would have been significantly better off if he had taken the plea bargain." *United States v. Kearn*, 90 F.4th 1301, 1310 (10th Cir. 2024). "In the plea-negotiation process, . . . [it] can be especially difficult to establish" that the outcome would have been different absent counsel's errors. *Byrd v. Skipper*, 940 F.3d 248, 259 (6th Cir. 2019). "During the pretrial, plea-bargaining process, prosecutors have broad discretion and may decide, based on any number of factors, to offer, to forgo, or to rescind a plea deal." *Id.* LoCurto's argument that he would have pursued plea negotiations with more zeal or enthusiasm, or would have instructed Batchelder to renew negotiations and not rejected a 20-year overture, is difficult to evaluate, since one cannot predict where such plea negotiations would have led. What offer would the government have made? What contingencies would the government have insisted upon? Which racketeering acts would LoCurto have been required to accept responsibility for? And would LoCurto have accepted such an offer? The outcome of some theoretical set of plea negotiations is speculative.[13] "[T]he art of plea bargaining involves 'complex negotiations suffused with

---

[13] These questions are why the Government argues the Andres Letter should not be considered a plea offer, and are behind the rationale (often unstated) for cases requiring "formal offers" to be present before finding prejudice. But it is plain that LoCurto is arguing, in the alternative, that a formal offer is not necessary, because bad advice about sentencing exposure can irrevocably and negatively impact a defendant's approach to plea negotiations generally. (*See* Pet'r's Post-Hr'g Reply at 3–4 ("The [G]overnment goes to great lengths in arguing that there was no [formal] plea offer in this case . . . . This argument, and the cases cited, are irrelevant because Petitioner's claim is that the erroneous and deficient advice he received . . . prevented any rational plea discussions from ever taking place.")).

uncertainty.'" *Houston v. Phillips*, No. 20-6102, 2022 WL 3371349, at *5 (6th Cir. Aug. 16, 2022) (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011)).

That being said, not every court has found that such uncertainty is a barrier to relief. In *Byrd*, defense counsel refused to conduct any plea negotiations at all, and convinced the defendant—based on a flawed and flatly incorrect understanding of criminal law—not to seek a plea, but also that he would be acquitted. *Byrd*, 940 F.3d at 251 ("[B]ased on an egregious misunderstanding of the law, his attorney conveyed to the prosecutor an unwillingness to consider a plea and conveyed to Byrd an assurance of acquittal—effectively halting plea negotiations before they could begin."). There were no plea negotiations, let alone any offer. And even in the absence of a plea offer (or negotiations), the defendant was prejudiced because he proceeded to trial—and opted out of any plea discussions—based on incompetent advice:

> Byrd's interest in proceeding to trial was rooted in misinformation gleaned from his counsel's faulty advice, making it an unreliable metric of reasonably probable outcomes. . . . [Counsel's] advice to Byrd was erroneous . . . . Thus, Byrd lacked the requisite information to weigh the options in front of him, and whatever desire he exhibited before trial is not dispositive of what he would have done if he were properly educated about the charges against him.

*Id.* at 258; *see also id.* at 259 ("Byrd's prior 'choice' to forgo a plea was no choice at all, being grounded on faulty counsel and therefore immaterial."). The Sixth Circuit concluded that a defendant could demonstrate prejudice "by establishing that he would have negotiated a more favorable plea deal and that with proper advice, the outcome of those negotiations would have been different." *Id.* at 255–56 (quotations omitted). As evidence that he would have negotiated a better outcome, the defendant was able to cite his co-defendant's plea agreement. *Id.* at 258; *cf. United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015) ("A petitioner may demonstrate that there existed a

reasonable probability of negotiating a better plea by identifying cases indicating a

willingness by the government to permit defendants charged with the same or a

substantially similar crime to plead guilty to a non-removable offense.").

      "The Circuits appear to be at odds with respect to this important

question. . . . [S]ome Circuits have held that this showing can be made without proof

that the Government had put a plea offer on the table, . . . while others seem to impose a

threshold requirement that a defendant cannot show prejudice if the government never

extended . . . [an] offer to the defendant." *Davis v. United States*, 143 S. Ct. 647, 647

(2023) (collecting cases, quotations omitted) (Jackson, J., dissenting from denial of

certiorari); *see also Carson v. United States*, 88 F.4th 633, 640 (6th Cir. 2023) ("Many

courts have held that a defendant cannot make out an ineffective-assistance claim

unless the prosecution puts a plea deal on the table. . . . [O]ur court has rejected this

approach.  In *Byrd*, we held that defense counsel can provide ineffective assistance in

violation of the Sixth Amendment by failing to *initiate* plea negotiations even when the

prosecution has proposed no plea terms."), *cert. denied*, 144 S. Ct. 2548 (2024), *reh'g

denied*, 144 S. Ct. 2702 (2024).  The Second Circuit has not weighed in on this question,

except in a pre-*Lafler* and pre-*Frye* case, where it suggested that a defendant's plea

bargaining strategy can be prejudiced by unreasonable advice.  *Gordon*, 156 F.3d at 380

("As to the government's second argument, the district court noted that whether the

government had made a formal plea offer was irrelevant because Gordon was

nonetheless prejudiced because he did not have accurate information upon which to

make his decision to pursue further plea negotiations or go to trial.  We agree with this

conclusion.").

For his part, LoCurto latches onto *Byrd*, and contends he would have acted differently if he received correct advice—he would have pursued plea negotiations, and he would have received and accepted a plea offer that was the same as his co-defendants.  (Pet'r's Post-Hr'g Br. at 25).  According to LoCurto, "if Batchelder had figuratively grabbed him by the shirt and told him that Oppenheim was wrong, he would have earnestly begun negotiations to conclude a 20-year plea agreement."  (*Id.* at 24).

But even assuming that "but for counsel's errors, the petitioner would have received a plea offer," *Byrd*, 940 F.3d at 257 (citing *Lafler*, 566 U.S. at 163–64, then *Frye*, 566 U.S. at 148–49), LoCurto "must also show that he would have accepted the offer."  *Id.*  There must be some evidence that he would have accepted a theoretical offer the Government would have made.  Said differently, upon receipt of the Andres Letter, would LoCurto have told Batchelder to accept or negotiate, instead of responding with expletives?  LoCurto insists that would have been the case.  At the hearing, LoCurto said "I refused the 20-year plea" only because he believed his "total sentencing exposure would have been 20 years."  (Nov. 6 Hr'g Tr. at 84:9–84:11).

Recognizing that the choices LoCurto "*actually made* do not necessarily shed any useful light on the choices that he *would have made* if he had been properly advised," *United States v. Thompson*, 27 F.3d 671, 677 (D.C. Cir. 1994), LoCurto's position—that he would have pursued negotiations differently and accepted a plea—falls apart for three independent reasons.

*First,* LoCurto's position requires the Court to ignore the mountain of evidence pointing in the other direction: that he was "insistent" he would prevail at trial and be acquitted of murder.  (*See, e.g.*, Feb. 2013 Batchelder Decl. ¶¶ 2, 5, 9; Jan. 10, 2006 Letter; Nov. 3, 2004 Letter; Suppl. Decl. of Harry C. Batchelder, Jr. dated July 15, 2021,

Pet'r's Ex. 87 (Resp't's Ex. 80) ¶¶ 3–4; Nov. 6 Hr'g Tr. at 134:21–135:9, 147:12–147:18). In other words, he would have proceeded to trial—and rejected all plea negotiations—even if Oppenheim had not given him deficient advice about the legal invalidity of a life sentence.

LoCurto, having been acquitted in state court for the murder of Platia, was confident that he would achieve the same result in federal court. He was not interested in pursuing plea negotiations, not because he valued the advice of one lawyer over another, but because he had no intention of ever accepting any plea, so confident he was of a positive outcome. *Supra* at 14–16. In fact, even Oppenheim—whose deficient advice is the basis of his claim—points out that LoCurto was committed and determined to go to trial, and LoCurto was acting out of that impulse, not on a weighing of the post-appeal, post-conviction life sentence against the merits of a 20-year plea offer. She recounted to him in 2010:

> I never believed your case was triable. You were so insistent that you "could beat the homicide" because you had been acquitted in state court, you simply would not listen to anything I said about the strength of the government's case. You were, I remember, particularly dismissive when I tried to explain the difference between the federal prosecution and the state prosecution—especially the fact that the state prosecutor was barred from mentioning or presenting evidence of Organized Crime during the state case.

(Letter from Oppenheim to LoCurto dated May 10, 2010 ("May 10, 2010 Letter"), Pet'r's Ex. 98 at 2). LoCurto's strategy was ultimately to go to trial, not to seriously weigh a plea offer of any kind, and if he was convicted, he was going to fall back on claiming ineffective assistance of counsel. (Nov. 6 Hr'g Tr. at 142:22–143:14). In *Knight*, the D.C. Circuit granted habeas relief where the defendant's circumstances "[did] not otherwise indicate that he was dead-set on going to trial no matter its risks and consequences." 981 F.3d at 1104. LoCurto was in the exact opposite category. There is

no credible basis to conclude that "he may well have responded . . . differently had counsel correctly advised him of . . . [the] sentencing consequences." *Id.*

Having observed LoCurto carefully during the hearing, and examined the objective evidence with great care, it is the undersigned's considered opinion that it was the acquittal on the state charges for the subject homicide that drove LoCurto's approach to plea negotiations and trial. His acquittal artificially inflated his hope of prevailing on the federal charges for the same event. And, of course, the acquittal long predated any of the misguided advice provided by counsel. In other words, his mind was made up long before Oppenheim provided her guidance.

"[D]efendants obviously weigh their prospects at trial in deciding whether to accept a plea," and as a result, "[w]here a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one." *Lee v. United States*, 582 U.S. 357, 367 (2017). But the opposite is also true; where a defendant believes—perhaps incorrectly—that he has a strong chance at a complete acquittal (and ignores advice to the contrary), then it is unlikely he will accept a plea. That defendant makes a decision to go to trial. Habeas relief is not available for a defendant seeking to redo the strategic decision gone wrong. *Meszaros*, 201 F. Supp. 3d at 277 ("[Defendant's] apparent resolve to try his case further weakens the credibility of his assertion that he would have accepted a deal.").

*Second*, though there is some evidence that LoCurto might have forgone trial—at one point he did ask Batchelder to pursue a 10-to-15-year sentence, *supra* at 16 n.8—he would have been required to plead guilty to the charged offense. But as noted, LoCurto never expressed any intention to plead guilty to a RICO conspiracy (either in 2005 or now). He refuses to acknowledge that he was a member of the Bonanno crime family

and that he committed crimes on its behalf.  So whatever general, generic, and amorphous interest LoCurto may have had in a plea deal, in reality he was not, and is not, willing to accept and admit guilt.

*Third*, this counterfactual—that LoCurto would have approached plea negotiations differently, and accepted or sought a deal similar to 20 years in prison—only works if LoCurto was *not* aware of the possibility that any life sentence would withstand appeal.

LoCurto has tried repeatedly to cast Oppenheim's advice as suggesting she told him definitively that a life sentence would be overturned.  (*E.g.*, Nov. 6 Hr'g Tr. at 75:24–76:5 ("She said it's possible you can get 20 years, but you're probably gonna get a life sentence . . . .  And if you do get the life sentence, I am going to get it overturned for you in the Second Circuit.")).  And he goes onto claim that Batchelder agreed with her. (*Id.* at 90:20–90:23 ("I told Harry: It's the same 20 years as before; that's all I can get, right?  So he answers: Yeah.  He answers in the affirmative yes, that he agrees that that's all I'm gonna get is 20.")); Decl. of Stephen LoCurto dated Sept. 26, 2010, Pet'r's Ex. 91 (Resp't's Ex. 74) ¶ 6 ("In subsequent discussions with Attorneys Oppenheim and Batchelder, it was advised that if the government didn't offer me a better plea than the max of 20 years, that I shouldn't take the 20 years.")).  LoCurto's testimony is simply not credible on either of these points.

For her part, Oppenheim makes clear she never told LoCurto that he was guaranteed to avoid a life sentence.  (May 10, 2010 Letter at 1 ("But, I never advised you or guaranteed to you that your total exposure, should you be convicted at trial, would be limited to 20 years—a sentence of life was always a possibility.")).  She notes that she only believed that it was "likely" that he would "prevail" on appeal.  (*Id.*).  Batchelder

confirms Oppenheim's account: "At no time did Ms. Oppenheim advise Petitioner that he should go to trial as he had nothing to lose." (Feb. 2013 Batchelder Decl. ¶ 7; Nov. 6 Hr'g Tr. at 155:6–155:7 ("She gave an opinion as to what a Circuit court *might* do in the future[.]") (emphasis added), 156:3–156:4 ("She indicated that it was an open question and that the Circuit could or could not rule in his–in his favor.")).

And Batchelder was and has been consistent that he told LoCurto of the possibility of a life sentence, that he disagreed with Oppenheim's view that a life sentence could be reversed on appeal, and that he repeatedly told LoCurto that he would receive a life sentence. (Nov. 6 Hr'g Tr. at 141:17–147:19 ("[D]uring that meeting I said, it's my advice that if you go to trial and fail at trial, you are going to get life."), 142:11–142:20 ("I told him . . . I believed I had better insight than anybody in that room as to what the Second Circuit would do. . . . Q: Better insight into what the Second Circuit would do with respect to foreclosing that Ex Post Facto claim, is that what you mean? A: Absolutely[.]")). LoCurto concedes the same in his briefing now: Batchelder "said there's a possibility" of "a life sentence." (Pet'r's Post-Hr'g Br. at 15).[14]

LoCurto was, without question, aware that he could receive a life sentence at trial. Indeed, his entire strategy of vacating a conviction on appeal was premised on being

---

[14] LoCurto contends that Batchelder only told him of a "possibility" of a life sentence, but did not "guarantee" such a result. And Batchelder did not "countermand" Oppenheim's advice, suggesting that he was left only with Oppenheim's advice that a life sentence would be reversed on appeal. (*See* Pet'r's Post-Hr'g Br. at 15, 25). The facts are to the contrary: Batchelder, in no uncertain terms, told LoCurto that he would receive a life sentence if he went to trial and was found guilty, even if he did not use the word guarantee. A defendant who is fairly apprised of the risks and reasonable possibilities is given competent advice about the probabilities of such outcomes. No reasonable attorney giving competent advice could make "guarantees" of trial or appellate outcomes; indeed, that is the opposite of reasonable or competent counsel.

given a life sentence by the District Court. And he cannot credibly dispute that Batchelder *also* told him that Oppenheim's argument was not guaranteed to work on appeal. This is not a case where "counsel failed to advise him of the worst-case scenario consequences of declining the plea offer." *Knight*, 981 F.3d at 1105. Where one attorney tells a defendant he can "beat the case," and another gives contrary, yet correct advice, the defendant has not established prejudice resulting from the deficient advice. *Logan v. United States*, 910 F.3d 864, 867–69 (6th Cir. 2018). And that is because the defendant receives, as LoCurto did, "the necessary information to make a call" on whether to plead guilty.[15] *Id.* at 871.

To conclude now that Oppenheim's incompetent advice—that a 20-year maximum sentence was the "likely" maximum sentence on appeal—prejudiced LoCurto's approach to plea negotiations requires ignoring several uncontroverted

---

[15] The cases cited by LoCurto, (Pet'r's Post-Hr'g Br. at 21–23), do not suggest—as he contends—that a defendant represented by two lawyers is prejudiced, because the deficient advice of one cancels out or taints the advice of competent counsel. Instead, these cases involve situations where one lawyer has a conflict-of-interest—for example, they represent both the defendant and a co-defendant or engaged in unethical conduct. That is not the case here. *E.g.*, *Rubin v. Gee*, 292 F.3d 396, 398 (4th Cir. 2002) ("The case involved two attorneys who in the aftermath of a crime schooled their client in the tactics of evasion in order to guarantee their own fee. Then to avoid criminal indictment and keep their conduct from coming to light, the attorneys took cover as part of the defense team."); *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991) ("[W]hen Gavin undertook to represent both Tatum and his partner, Mann, he enmeshed himself in an active and irreconcilable conflict of interest. When representing Tatum, he could never fully develop the defense that Tatum relied on the advice of Bernstein & Longest (with which Mann was associated) and to attempt to shift responsibility to the firm. Were Gavin to do so, he would tend to inculpate his other client, Mann, and to increase the risk of civil malpractice liability of the firm in which both Mann and he were partners."); *Stoia*, 22 F.3d at 767–68 (defendant had conflicted counsel where one lawyer previously entered into a plea agreement with federal prosecutors whereby he agreed not to "represent individuals charged with crimes under investigation by the United States Attorney's office [or] any federal law enforcement authority" (quotations omitted)).

threads of proof: (1) LoCurto's contemporaneous insistence on going to trial, which was based not on the analysis of sentencing exposure, but on his belief of repeating his state court victory; (2) LoCurto was and remains unable to be plead guilty to the charged offense, a RICO conspiracy; and (3) both his lawyers—even Oppenheim—told him in no uncertain terms that he could receive a life sentence that withstood appeal (with Oppenheim telling him that it was only "likely" that he would win on appeal, not that it was guaranteed).

Each of these independently precludes a finding that—despite one of his lawyers providing deficient plea advice—LoCurto suffered prejudice warranting Section 2255 relief.

## II.    Certificate of Appealability

Rule 22(b) of the Federal Rules of Appellate Procedure provides that, "in a 28 U.S.C. §2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). Section 2253(c) provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" does not require that a petitioner demonstrate that he would prevail on the merits of his appeal, but only that the issues he raises are "debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 330 (2003) (quotations omitted).

Judge Orenstein found, and Judge Garaufis likewise concluded, that LoCurto received objectively unreasonable advice, *i.e.*, he satisfied the first *Strickland* prong.

33

The number of Section 2255 petitioners who make such a showing is exceptionally small. Even when he cannot demonstrate prejudice, it is appropriate to grant such a petitioner a certificate of appealability. *E.g.*, *Hanks v. United States*, 818 F. App'x 90, 91–92 (2d Cir. 2020) (reviewing § 2255 petition following grant of certificate of appealability where counsel provided unreasonable advice but petitioner failed to demonstrate prejudice).

CONCLUSION

For the reasons stated above, the Court respectfully recommends that the petition be denied and a certificate of appealability should issue. Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time may waive the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate[] [judge's] report operates as a waiver of any further judicial review of the magistrate[] [judge's] decision.") (quotations omitted).

*/s/Sanket J. Bulsara* Nov. 19, 2024
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York